**This order is SIGNED.**



**Dated: December 4, 2018**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>GENERAL AERONAUTICS<br>CORPORATION,<br><br><br>Debtor. | Bankruptcy Number: 17-28510<br><br>Chapter 11<br><br><br>Hon. R. Kimball Mosier |

---

## MEMORANDUM DECISION

---

General Aeronautics Corporation and other related companies have tried to build and market gyroplanes for over 30 years, but business has not been easy. Funding shortfalls have been common, and the company could not afford to pay employees their full compensation for significant stretches of time. When the last shortfall hit in early 2015, many of its remaining employees resigned or were laid off. The company received new funding in late 2016, and word spread among the former employees and creditors, who joined together to consider their options. On September 28, 2017, Jason Chen, Jacob van der Westhuizen, Robert Wilson, Howard Kent, William Scott Carron, and Henry Parry II filed an involuntary petition against General Aeronautics, asserting claims principally for unpaid rent, unpaid compensation, and loans made

to the company.[1] They were joined by three additional creditors—Carolynn Taft, Martie

Nadauld, and Lori Chigbrow—on June 25, 2018 (with the original six, the Petitioning Creditors).

General Aeronautics controverted the petition and filed a motion to dismiss it and a

motion to require the Petitioning Creditors to post a bond. The Court conducted preliminary

hearings on those matters and set a date for trial. Shortly thereafter, General Aeronautics filed a

separate motion to dismiss the case under 11 U.S.C. § 305(a).[2] The Court conducted trial on all

of these matters on September 18, 19, 20, 24, 26, and 27. After thoroughly reviewing the

evidence and assessing the credibility of witnesses; and having read the motions, memoranda,

and briefs; and having heard the arguments of counsel and conducted its own independent

research of applicable law, the Court issued its ruling from the bench on October 4, suspending

proceedings for 60 days under § 305(a). The Court reserved the right to enter a written decision

memorializing that oral ruling without altering its substance or the Court's final judgment. In

accordance with that reservation the Court issues the following Memorandum Decision.[3]


## I. JURISDICTION

The Court's jurisdiction over this contested matter is properly invoked under 28 U.S.C.

§ 1334(b) and § 157. This a core proceeding under 28 U.S.C. § 157(b)(2)(O), and the Court may

enter a final order. Venue is appropriate under 28 U.S.C. §§ 1408 and 1409.

---

[1] The involuntary petition was subsequently amended on April 10, 2018.

[2] All subsequent statutory references are to Title 11 of the United States Code unless otherwise indicated.

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable in contested matters by Fed. R. Bankr. P. 9014(c). Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

## II. FINDINGS OF FACT

### A. The Debtor's History

David Groen, a former Army helicopter pilot who served in the Vietnam War and flew

commercially afterward, founded Groen Brothers Aviation, Inc. (GBA) in the mid-1980s with

the goal of developing and bringing to market the technology of sustained autorotative flight

using gyroplanes and other similar aircraft. While gyroplane technology has existed for

approximately a century—it was the brainchild of Juan de la Cierva in the years shortly after

World War I—Groen used his knowledge of helicopters to make improvements, such as the

addition of collective pitch control, to gyroplanes. GBA believed that these advances, along with

the particular characteristics of gyroplanes that distinguish them from helicopters and airplanes,[4]

would allow it to carve out a niche in the aircraft market.

GBA grew sporadically. Its funding in the early days consisted of numerous investments

from small shareholders, and it was often playing catch-up on its financial obligations. By 2001,

it had not brought a product to market that generated any meaningful revenue. That same year,

GBA received a $5 million investment, which allowed it to begin a program to achieve FAA

certification on an aircraft called the Hawk 4. But the ebb in the aviation industry after the 9/11

terrorist attacks caused GBA to lay off approximately 100 of its 135 employees. It weathered the

downturn and secured a contract to begin work on a project called the Heliplane for the Defense

---

[4] The most critical distinction between a helicopter and a gyroplane is that the former's top rotor is powered during flight, while the latter's is not. A powered rotor requires a transmission and other complex systems, which increase aircraft weight and require extensive and frequent maintenance. In addition, helicopters are more difficult to fly, particularly in the event of engine failure. By contrast, the gyroplane's non-powered rotor makes it easier to fly, while at the same time reducing maintenance costs. In addition, gyroplanes do not need the long runways that airplanes do, and they can fly low and at speeds that would be dangerous for airplanes.

Advanced Research Projects Agency (DARPA) around 2005, and employment numbers

rebounded. Even so, GBA frequently remained short of cash and required additional investment.

Although GBA completed the first of four phases required under the DARPA program, the

contract was not renewed. The loss of the contract combined with the Great Recession led to

another bout of financial trouble. GBA asked employees to defer compensation and eventually

accrued approximately $1 million in unpaid wages and salary, which it later repaid, but it laid off

90 of 96 employees in 2007-08.

 After those layoffs GBA stalled. Of the 20 engineers and 20 drafters it employed during

the peak of the DARPA project, it retained only one of each after the layoffs. Its debt structure

discouraged additional investment, and it produced nothing from 2008-12. GBA eventually

changed its name to Groen Brothers Aviation USA, Inc. and developed a financial restructuring

and recapitalization plan whereby it would transfer its assets, employees, and operations to a new

entity, Groen Brothers Aviation Global, Inc. (GBAG).[5] As part of that plan, GBA's creditors

would have their debt converted into equity in GBAG. Trade creditors, utilities, and employees

were excluded from this conversion arrangement. After some delay, the transfer from GBA to

GBAG was carried out in December 2012 (Transition).

 Freed from the debt of GBA, GBAG was supposed to attract new investment from certain

funds managed by Steven Stevanovich, who is currently one of two Executive Directors of the

debtor. The expected funding did not materialize, however, and cash was acutely scarce pre- and

post-Transition, which led to reductions in employee pay and, as before, the accrual of unpaid

---

[5] GBA continues to exist as a corporate entity but has no current operations. Its only asset is approximately $1.5 million in stock in the new, post-Transition company.

compensation.[6] GBAG's finances were uncertain enough that it asked its landlord in December 2013 for some time to vacate the property in the event it could not pay rent.[7] In addition, employment numbers had not recovered to prior levels. GBA had 47 employees on its payroll in January 2012, many of them part-time or temporary.[8] Those numbers dropped to 13 at GBAG a year later,[9] but later climbed to as high as 28 in November 2014.[10]

In early 2014, Jason Chen, who had previously worked for GBA as a fundraiser from 2004-08 and as an advisor for a shorter six-month period, was asked by GBAG to investigate and pursue a potential deal with Wuhai, a city in Inner Mongolia, China. That deal did not come to fruition. Though not formally appointed, Chen became de facto CEO, and at his insistence the company changed its name to General Aeronautics Corporation (GAC). With Chen's assistance, GAC negotiated with the Aviation Industry Corporation of China (AVIC) to form a joint venture to develop and produce a two-seat and a four-seat aircraft. While the parties signed a letter of intent in July 2014 and a cooperation agreement in December 2014, the deal was later terminated. Chen also provided much-needed cash, which was used to fund payroll and other expenses. But when Chen left GAC the company ran out of money and in January 2015 it laid off nearly all of its employees (2015 Layoffs). Other employees, including executives Robert Wilson and Jacob van der Westhuizen, resigned.

As GBA had done in 2008, GAC entered a period of doldrums. Groen, who was restored as CEO shortly after the 2015 Layoffs, was one of five employees remaining, though GAC had

---

[6] *See infra*, Section II.C.
[7] Ex. H. GBAG had also proposed a plan for the payment of delinquent rent.
[8] Ex. WWW, at PPE 01-07-12 tab.
[9] *Id.* at PPE 01-05-13 Reduced Rates tab.
[10] *Id.* at PPE 11-22-14 Reduced Rates tab.

no operations. By April 2015, it had $205 left in its bank account. GAC received relatively

modest amounts of funding beginning around May 2016 and started to repay some amounts

owed to former employees.[11] Then with Groen at the helm, GAC changed its name to Groen

Aeronautics Corporation. In late 2016, Groen Aeronautics began conversations with West

Mountain Partners, L.P. to fund the development of a new aircraft. The company believed it

needed approximately $13 million to complete the project or $5 million to create a prototype,

and in November 2016, West Mountain agreed to invest $5 million with the option to invest up

to $8 million more.[12] The following month, $4,993,290.77 was deposited into the bank account

of GAC Unmanned Aircraft Systems, Inc.,[13] the wholly-owned subsidiary of Groen Aeronautics.

There is no evidence that West Mountain has invested funds beyond the original $5 million.

Once Groen Aeronautics received those funds, Groen and the board grappled over

authority to use them. Groen's apparent insistence on using a portion of that money to repay

some of GAC's old debts led to the board ousting Groen as CEO and a board member in January

2017. By May 2017 Groen Aeronautics had changed its name to Skyworks Global, Inc. Since

Groen's ouster Skyworks has spent substantial sums of money, but it has largely ignored the old

unpaid debts accrued at GAC.[14]

GAC presently has three employees and outsources its engineering work. While

developing an aircraft from design to production is an admittedly long and difficult process,

---

[11] See infra, Section II.E.

[12] Ex. QQ, at SKYWORKS000193-94.

[13] Ex. SS, at SKYWORKS000709.

[14] The name of the debtor on the petition is General Aeronautics Corporation, Skyworks's name when some of the Petitioning Creditors worked for it. GBAG, GAC, Groen Aeronautics Corp., and Skyworks all refer to the same corporate entity. For simplicity's sake, and unless specified otherwise, the Court will use GAC—the name used on the petition—to refer to the debtor regardless of whether the debtor's name was something different at the time of the event under discussion.

GAC has not built a gyroplane. During its existence GBA only built ten, none of which received

FAA certification. Like GBA before it, GAC has not generated meaningful revenue during its

existence and is entirely dependent on equity investments or loans to fund its operations.

GAC is currently pursuing, to varying degrees, six projects for the application of its

technology.[15] Two projects—the Hawk 6e and the Gyroliner—are in the earliest stages of

development and their potential for success is unclear. The Hawk 6e is a six-seat electric

composite-body gyroplane that exists only in an artist's conception; the design process has not

yet begun. But other aviation companies have started to explore the market for distributive

electric propulsion, in which the Hawk 6e would compete. The Gyroliner is a passenger airplane

fitted with a rotor—a modern analogue to the Fairey Rotodyne—and is intended to serve the

inner-city market in India. Brigadier General (Ret.) John Michel, the other Executive Director at

GAC, testified that the company is in early-stage discussions regarding the Gyroliner, but it is

undisputed that it has not been built. The third project aims to resurrect the Heliplane with

DARPA, whose "Red Team"—a group that evaluates and scrutinizes potential projects—was

scheduled to review the Heliplane on October 15, 2018 to determine if it should move forward.

The fourth project is a collaboration with FedTech whose goal is to develop the Precision

Airdrop System, which has the stated capability of dropping up to a ton of material within a

meter of its intended target. Potential applications for such technology include humanitarian aid

organizations and the military, and GAC believes that a sizeable market will develop in the next

few years. The fifth project is reenergizing the SparrowHawk line, a small, experimental two-

---

[15] *See* Ex. SG71.

seat gyrocopter. GAC intends to build an updated version called the SparrowHawk 4 and is attempting to sell the five SparrowHawks it has in inventory for $50,000 each.

The sixth project, the Hawk 5, is the closest to realization and offers the best chance at producing revenue in the near term. The Hawk 5 is a five-seat gyroplane that is currently GAC's primary initiative. GAC has been in negotiations with the Serbian government and Jugoimport-SPDR J.P. (Jugoimport), a government conglomerate that includes Avio Industrija d.o.o. (UTVA), Jugoimport's operating subsidiary, to produce a Hawk 5 prototype. After trial, GAC supplemented the record with a contract signed with Jugoimport for the fabrication, assembly, and flight testing of a prototype. Gen. Michel testified that he hopes a prototype will be produced within six months. While a prototype is necessary to attract potential orders, whether the Hawk 5 will enter production and generate revenue is another matter. Gen. Michel believes GAC would receive thousands of orders for the Hawk 5, which would sell at $650,000 to $1,000,000, depending on the region to which it was sold and the aircraft's features and mission objectives. He also estimates that profit margins on the aircraft will be 20-30%. But these figures were not corroborated by additional evidence, and the commercial manufacture of the Hawk 5 is not a fait accompli. Even though Jugoimport has agreed to produce a prototype, the contract with GAC expressly states that further production of the Hawk 5 "will be the subject of a separate contract."

**B. The Market for Gyroplanes[16]**

While gyroplane technology has existed for a century and predates that of helicopters, gyroplanes have not achieved the popularity or market share of other aircraft. For most of its

---

[16] The parties did not present extensive evidence on the gyroplane market, but there were enough snippets that can be pieced together to form an impression of the market that will be helpful in evaluating GAC's § 305 motion.

history, the market for gyroplanes has been the province of sport enthusiasts. There have been attempts at producing larger gyroplanes for commercial transportation—the Fairey Rotodyne, developed in the United Kingdom in the 1950s, is one notable example—but they have not brought sustained success. At present, there may be up to 32 companies building gyroplanes. One of the leaders in that group is AutoGyro, a German company that produces 300-400 aircraft per year and generates approximately $40 million in annual revenue. AutoGyro also achieved FAA type certification on one of its models in 2016. Certification allows a company to sell an aircraft across a much broader range of applications; without it, the company is limited to experimental or sport craft applications. In addition to AutoGyro, certain large aircraft manufacturers, including Boeing and Airbus, are developing products that, while not gyroplanes themselves, have functionalities that could eat into the gyroplane market share.

## C. Reductions in Pay

The lack of funding in 2012 caused GBA to tighten its belt. One cost-cutting measure was a request for all employees, executive and non-executive alike, to reduce their compensation around April 2012.[17] It was not a mandatory reduction; employees were asked to do what they could, and while not all employees agreed to reduce their compensation, some did in varying amounts. Employees indicated their consent to a reduction in pay via email. As the Transition approached, GBA notified employees that "[i]nitially compensation levels in [GAC] will . . .

---

[17] It is unclear whether all employees were asked to do this at the same time, but the evidence suggests that pay reductions took effect for three executives—Groen, Wilson, and van der Westhuizen—on April 15, 2012, while for all other employees who opted to reduce their pay, the reductions began on April 29, 2012. *See* Ex. WWW, 2012 Accr Payroll-Reduced Rates tab.

remain at the current reduced levels."[18] And although the company expressed optimism that it could restore employee pay to their former levels within 60 days after the Transition,[19] those reduced rates persisted until the 2015 Layoffs.[20] GAC was unable to pay employees all of their compensation post-Transition at those lower amounts (Unpaid Compensation).

The parties have disputed whether GBA and, later, GAC promised to repay the difference between non-executive employees' former compensation levels and their reduced compensation levels (Deferred Compensation), along with a 25% bonus to incentivize employees to take a pay cut (Bonus Compensation).[21] But there is no dispute. Numerous former non-executive employees separately testified that GBA and GAC promised them Deferred and Bonus Compensation, and though the promise was an oral one, their testimony on that point was credible. In particular, the voluntary nature of the reduction supports the employees' version of events. If non-executive employees were not offered Deferred or Bonus Compensation, but also did not have to reduce their compensation, it seems unlikely that many of them would opt for the reduction. But 10 of the 41 non-executive employees on GBA's payroll on May 12, 2012 chose to take a pay cut in some amount.[22] A year later, 11 of the 18 non-executive employees on GAC's payroll continued to take a pay cut.[23] It is unlikely that they would have made that choice and stuck with it, knowing that some of their peers who chose not to reduce their compensation were being paid in full while company executives were accruing Deferred and Bonus

---

[18] Ex. AAA.
[19] *Id.*
[20] *See* Ex. WWW, 2012 Accr Payroll-Reduced Rates tab.
[21] Groen made clear that executives would receive Deferred and Bonus Compensation.
[22] Ex. WWW, PPE 05-12-12 Reduced Rates tab.
[23] *Id.* at PPE 05-11-13 Reduced Rates tab.

Compensation, if they did not also expect to be repaid at some point in the future. Moreover, at least two previous times during its existence GBA asked employees to reduce their compensation, and both times GBA eventually paid back the difference to its employees. But GAC never explained why many of the same employees who had gone through those previous rounds of pay cuts and repayments would agree to a third pay cut without at least a promise of repayment. It simply is not credible, given past practice at GBA, that they would have agreed to such an arrangement.

In addition, two pieces of documentary evidence support the Petitioning Creditors' contention. The first is Wilson's December 2012 letter, which was written to all employees, not merely executive employees, to inform them of the imminent Transition and to outline certain HR matters related to the Transition. One such matter is employee compensation. Wilson's letter carefully distinguishes between two categories of compensation. The first is the difference between pre- and post-May 2012 levels of compensation and the incentive bonus accrued after transition to GAC. The second is the difference between pre- and post-May 2012 levels of compensation and the incentive bonus accrued prior to GBA's transition to GAC.

> As you may recall, David [Groen] indicated in an October meeting with staff that it should be possible to reinstate pay to pre-May levels within 60 days of closing. The difference between pre- and post-May levels accrued <u>after transition within [GAC]</u>, along with a 25% incentive for those still working at [GAC], should follow soon thereafter.
>
> Separately, we must address the difference, and incentive bonus, between pre- and post-May levels, that has been accrued <u>prior to transition within [GBA]</u>. We remain committed to making these payments as soon as possible.[24]

---

[24] Ex. AAA.

The references to these categories show that GBA initially offered, and GAC continued to offer, Deferred and Bonus Compensation to all of its employees, not just executives. Importantly, Wilson's letter states that Deferred and Bonus Compensation accrued post-Transition would be paid soon after GAC returned employee pay to pre-May 2012 levels. In other words, GAC not only acknowledged its obligation to repay Deferred and Bonus Compensation, but also tentatively scheduled a time to do so.

The second piece of documentary evidence is the means by which GAC would know exactly how much to repay: an Excel spreadsheet maintained by Lori Chigbrow, who was the accounting manager for GBA and GAC. Created at the direction of company executives, the spreadsheet tracked payroll payments for individual pay periods from January 7, 2012 to January 31, 2015. And once the reduced pay rates began in April 2012, it also tracked Unpaid, Deferred, and Bonus Compensation both pre- and post-Transition.[25] And that spreadsheet tracked those categories of compensation for executive and non-executive employees alike. The statements in Wilson's letter and the tab in Chigbrow's spreadsheet tracking Deferred and Bonus Compensation would not exist if GBA and GAC had not offered Deferred and Bonus Compensation to all of their employees.

GAC's evidence on this issue is not compelling. Groen explained that, after consultation with company leadership in 2012, he asked all employees to take a cut in pay, but executives alone would receive Deferred and Bonus Compensation. The asserted rationale for that disparate treatment was concern over potential investment in GBA or GAC. Groen stated that Wilson

---

[25] *See* Ex. WWW. Unpaid Compensation is summarized in the Detail Unpaid Payroll tab, while Deferred and Bonus Compensation are found in the 2012 Accr Payroll-Reduced Rates tab.

12

would not have permitted non-executive Deferred and Bonus Compensation because an investor

would be less likely to put money into GBA or GAC if it saw those obligations on its books.

This explanation has two faults. First, the assertion that Wilson would not approve non-

executive Deferred and Bonus Compensation is directly contradicted by his December 2012

letter, where he acknowledged that all employees are entitled to Deferred and Bonus

Compensation. Second, the concern that non-executive Deferred and Bonus Compensation

would scare away investors is belied by the fact that GBA and GAC offered such compensation

to its executives in amounts that dwarfed any potential non-executive Deferred and Bonus

Compensation. While non-executives who reduced their pay outnumbered executives who did so

by more than 2-to-1, the executives earned more and reduced their salaries by far greater

amounts than non-executives, so they accounted for over 98% of all post-Transition Deferred

Compensation.[26] GAC has argued that payment of executive Deferred and Bonus Compensation

was contingent on approval by GBA's and, later, GAC's board, and has implied, albeit without

justification, that this condition might mollify potential investors. But GAC never explained why

it could not also have attached the same condition to non-executive Deferred and Bonus

Compensation. Based on the substantial amount of executive Deferred and Bonus Compensation,

it is not plausible that an investor would be frightened by the marginal addition of non-executive

Deferred and Bonus Compensation.

---

[26] *See id.*, at 2012 Accr Payroll-Reduced Rates tab.

### D. The Labor Commission Claimants

Three of the Petitioning Creditors—Parry, Nadauld, and Carron—filed claims for Unpaid Compensation with the Utah Labor Commission. All three received judgments in their favor, including a 100% penalty and attorney's fees, which collectively totaled $69,549.73.[27] GAC entered into a payment agreement with the state to repay that amount and began making monthly payments of $2,250 in July 2016, which continued through the filing date.[28] As of that date GAC had paid $33,750 towards those judgments, leaving a balance of $35,799.73.[29] A claim with the Labor Commission for unpaid wages is limited to either the unpaid wages in the year prior to the claim or $10,000.[30] All three of the employees who filed claims with the Labor Commission had Unpaid Compensation in excess of $10,000.

### E. The Payment Plan

When GAC received additional funding around May 2016, Groen directed that a portion of it be used to pay unpaid wages to former employees (Payment Plan).[31] GAC rehired Chigbrow as a contractor from May 2016 to April 2017 to track the Payment Plan. At Groen's request, she created an Excel spreadsheet listing the amounts owing and those paid.[32] Based on those

---

[27] Ex. SG55.

[28] *Id.*

[29] Ex. BBBB, a table prepared by GAC for this litigation which lists its outstanding liabilities as of September 30, 2017, shows a $58,400 balance owing to the Utah Office of State Debt Collection. The discrepancy between that amount and the amount remaining in Ex. SG55 was not explained at trial. The evidence indicated that GAC was making payments towards the Labor Commission judgments as shown in Ex. SG55, so the Court will view the $35,799.73 pre-petition balance remaining as correct.

[30] *See* Utah Code Ann. § 34-28-9(1)(a)(d)-(e) (2017).

[31] The Court excludes regular payments to the Labor Commission from the Payment Plan, but Parry, Nadauld, and Carron each received a single payment in May 2016 which was not part of the Labor Commission payments. *See* Ex. VVV, at Unpaid Payroll tab. Those single payments will be counted as part of the Payment Plan in determining their claims.

[32] Ex. VVV, at Unpaid Payroll tab. That spreadsheet tracks payments through February 2017. Ex. SG55 tracks payments to a smaller subset of employees, but through December 2017.

exhibits, GAC appears to be repaying Unpaid Compensation as well as unpaid wages earned pre-Transition at GBA under the Payment Plan.[33] The Court will address the issue of whether GAC is paying certain debts of GBA in greater detail in Section II.F, *infra*. But for purposes of accounting for payments under the Payment Plan, there was no evidence on whether those payments would be allocated first to unpaid wages accrued pre-Transition at GBA or Unpaid Compensation accrued post-Transition at GAC. For the purposes of this decision, the Court will allocate the payments to Unpaid Compensation accrued post-Transition at GAC.

The Payment Plan began in May 2016 and, based on testimony from some of the Petitioning Creditors, has continued uninterrupted at least through approximately June 2018. It appears that executives were excluded from the Payment Plan,[34] and certain former employees who went back to work for GAC, such as Terry Brandt and Jehan Khan, were removed from the Payment Plan once they resumed work for the company. While GAC paid a total of $12,454 to former employees under the Payment Plan in May 2016,[35] it typically paid $4,200 per month from June 2016 through September 2017.[36] By the filing date GAC had paid at least $67,831.11 under the Payment Plan.[37]

---

[33] The amounts to be repaid to non-Labor Commission employees in column C of the Unpaid Payroll tab of Ex. VVV match the amounts in column BM of the Detail Unpaid Payroll tab of Exhibit WWW. Column BM is the grand total of unpaid wages accrued pre-Transition at GBA and post-Transition at GAC.

[34] Terry Brandt was at one time listed as Vice President of Flight Operations, *see* Ex. SG39, but was not considered an executive for purposes of compensation, *see* Ex. WWW, at Detail Unpaid Payroll tab, or the Payment Plan.

[35] Ex. VVV, at Unpaid Payroll tab.

[36] *See id.* & Ex. SG55. The monthly totals in Ex. SG55 appear to be lower because there are some employees omitted from that spreadsheet who are included in Ex. VVV. Ex. SG55 also appears to omit GAC's payment of employment taxes on amounts paid to employees.

[37] *See* Ex. SG55. This figure is likely higher because Ex. SG55 undercounts payments compared to Ex. VVV. But Ex. VVV cannot be used for this calculation since it only runs through February 2017.

**F. Responsibility for GBA's Debts**

GAC disclaims any responsibility to pay GBA's debts, particularly compensation that employees earned but did not receive from their time at GBA. According to Groen, these debts were never GAC's obligation, though their repayment ultimately hinged on GAC's success. Once GAC had sufficient cash it planned to buy back the $1.5 million in stock GBA held, thereby providing GBA with funds to pay off its delinquent debts.

Despite Groen's testimony, the evidence suggests that GAC is paying some of GBA's debts under the Payment Plan, and Groen wanted to pay more of these debts when GAC received funding from West Mountain in late 2016. In addition, Wilson's December 2012 letter appears at first glance to convey GAC's willingness to repay GBA's debts. The letter states that "[w]e remain committed to [paying certain categories of unpaid compensation accrued pre-Transition] as soon as possible," and that all of GBA's debt "will be an important priority" and "will be handled appropriately after [the] [T]ransition."[38] Critically, however, on whose behalf Wilson spoke in the context of that letter is not clear: "we" could refer to GBA, GAC, or simply management, and the use of "we" elsewhere in the letter evinces a similar ambiguity. The letter stops short of obligating GAC on GBA's debts and is ultimately consistent with Groen's contention that GBA's debts would be repaid once GAC bought back its stock.

Ultimately, these pieces of evidence do not establish GAC's responsibility for GBA's debts. Groen's desire to repay those debts with GAC funds does not create an obligation, and in

---

[38] Ex. AAA.

16

any event GAC's board overruled Groen on that point. Similarly, mere payment of unpaid compensation under the Payment Plan does not establish liability for those amounts.

## G. GAC's Board of Directors

GAC had a five-person board post-Transition which consisted of Groen, who served as the chairman, Wilson, John Carter, George Rudman, and Masoud Emami.[39] The board members were scattered around the country and the globe, so the board never conducted a meeting between the Transition and the time of trial. Instead, it would use email or phone calls to discuss matters that required board approval in an attempt to reach written unanimous consent. Among the matters that purportedly required board approval were expense reports, loans, issuance of stock, and appointment to executive positions.

The overwhelming weight of the evidence, however, shows that GAC's board frequently abdicated, if not entirely ignored, its oversight responsibilities regarding these matters. The only two documented board actions from 2013 to the 2015 Layoffs were its approval of the name change from GBAG to GAC and its acceptance of Chen's resignation as CEO.[40] In addition, the board never formally appointed Wilson as an officer of GAC even though he performed essential executive functions, including managing the company's cash flow. Nor did it approve Chen as CEO, even though he held himself out as such during his time with the company.

More troubling is the board's apparent lack of oversight and knowledge regarding GAC's finances. The board never approved any expense reimbursements from 2013 to the 2015 Layoffs

---

[39] *See* Ex. HH. That exhibit lists the board members as of January 2015. Groen, Wilson, and Carter had been on the board since the Transition. It is unclear whether anyone preceded Rudman and Emami in their seats on the board, but that is not material to this decision.
[40] *See* Exs. GG & HH.

even though employees were incurring expenses during that time. Groen testified that while he was supposed to be actively involved in the company as chairman, there were many things of which he was not aware. As an illustrative and astonishing example, Groen did not know that GAC had no money after the 2015 Layoffs—this following a year in which GAC required frequent cash infusions from Chen and his contacts totaling hundreds of thousands of dollars just to make payroll.

GAC has argued that the asserted loans and expenses that make up some of the Petitioning Creditors' claims are in bona fide dispute because the board did not authorize those amounts. But there is a glaring incongruity between the board's assertion of fastidious and rigid adherence to company protocol in this case and how the board functioned in practice. The board's failure to discharge its oversight responsibilities during the events in question leads to only one reasonable conclusion: GAC's board, either by decision or inaction, essentially let the executives run the company at their discretion. Perhaps this was a necessary step. GAC faced funding emergencies on a regular basis, which were particularly acute in the 2013-14 period. The widely-dispersed board may have been too slow to respond to these crises as they arose, while company executives had the ability to react quickly and decisively.

## H. Claims of the Petitioning Creditors

### 1. Howard Kent

Howard Kent personally owned commercial real estate located on West California Avenue in Salt Lake City, UT, and, as landlord, entered into a five-year lease agreement dated

January 3, 1997 with GBA for the lease of suites A-E at that location.[41] The lease was

subsequently amended, with GBA increasing its footprint in the building to include suites F-H.[42]

The fourth amendment, dated December 14, 2011, reduced the leased space to the original suites

A-E and provided that monthly rent would consist of a base rent of $9,072.50 plus $2,745.63 in

monthly building operating costs (or CAM) for a total of $11,818.13 per month.[43] The term of

the fourth amendment ran from September 12, 2011 until September 30, 2012.[44]

     While there were no subsequent amendments to the lease, it is undisputed that GBA

continued to occupy the space and GAC occupied the space post-Transition until Kent sold the

West California Avenue property sometime in late 2014. It is also undisputed that Kent

continued to assess rent in precisely the same amounts as he did under the fourth amendment.[45]

From January 2013 through October 2014, Kent assessed monthly rent of $12,409.04, consisting

of a base rent of $9,072.50, $2,745.63 in CAM, and $590.91 in late fees. In November 2014,

Kent assessed only the base rent and CAM for a total of $11,818.13. Therefore, from January

2013 to November 2014, Kent assessed $284,817.01 in rent. GAC made over $94,000 in

payments that were allocated to rent owing from January 2013 forward.[46] After deducting those

payments, the balance owing was $190,172.65, the same amount Kent asserted in the amended

involuntary petition. GAC's Accounts Payable Aging Summary dated January 15, 2015 lists the

---

[41] Ex. B.
[42] *See* Ex. C.
[43] *Id.*
[44] *Id.*
[45] *See* Exs. D & E.
[46] *See* Ex. D.

amount owing to Kent as $177,763.61,[47] which is $12,409.04—or one month's rent—lower than the amount due in Kent's invoice. Although that discrepancy was not explained at trial, the Court surmises that GAC believes it made an extra month's rent that is not reflected in the invoice. Kent has not been paid any of the amount listed in the aging summary.

### 2. Lori Chigbrow

Lori Chigbrow began working for GBA in 2002, became a part-time employee in 2008, and continued in that capacity post-Transition at GAC until she lost her job as part of the 2015 Layoffs. Chigbrow agreed to a 25% reduction in pay effective as of the pay period ending on June 9, 2012,[48] which carried over to her time at GAC. Chigbrow accrued $6,575.43 in Unpaid Compensation, $5,550.60 in Deferred Compensation, and $1,387.65 in Bonus Compensation for a total of $13,513.68.[49] Chigbrow received $4,627.77 under the Payment Plan through September 2017,[50] reducing her claim to $8,885.91 as of the filing date.

### 3. Carolynn Taft

Carolynn Taft, then known as Carolynn Schmidtke, began working for GBA in October 2007 and continued with GAC post-Transition. Taft agreed to reduce her compensation by 15% in May 2012,[51] which continued post-Transition at GAC. She accrued $6,688.63 in Unpaid Compensation,[52] $554.94 in Deferred Compensation, and $138.74 in Bonus Compensation,[53]

---

[47] Ex. A.
[48] Ex. WWW, at PPE 06-09-12 Reduced Rates tab.
[49] *Id.* at Detail Unpaid Payroll and 2012 Accr Payroll-Reduced Rates tabs.
[50] *See* Ex. SG55.
[51] Ex. WWW, at PPE 05-12-12 Reduced Rates tab.
[52] *Id.* at Detail Unpaid Payroll tab. This amount is corroborated by an email Taft sent to Groen at the time of the 2015 Layoffs stating GAC owed her $6,688.63. Ex. CCC.
[53] Ex. WWW, at 2012 Accr Payroll-Reduced Rates tab.

20

and has a $43.60 expense claim.[54] GAC paid Taft $4,709.72 under the Payment Plan prior to the

filing date.[55] As a result, Taft has a total claim of $2,716.19.

### 4. Henry Parry

Henry Parry began working for GBA in 1989 and continued at GAC after the Transition.

He took a 20% reduction in pay in May 2012,[56] which remained in effect until July 2014, when

his former pay level was restored.[57] GAC did not always pay Parry what he was owed at either

level, and he later filed a claim with the Labor Commission for $9,570.69, which included wages

of $9,175.13 owed to him after March 1, 2014, plus expense reimbursements of $395.56.[58] Parry

also kept a detailed account of the Unpaid Compensation owed to him until March 1, 2014.[59]

Excluding the unpaid wages from Parry's time at GBA, Parry's calculation shows that he

accrued $27,739.30 in Unpaid Compensation at GAC.[60] He also accrued $12,602.18 in Deferred

Compensation, and $3,150.55 in Bonus Compensation.[61] Subtracting from those sums the $2,357

Parry received under the Payment Plan[62] leaves a claim of $41,135.03.

---

[54] Ex. A.

[55] *See* Ex. SG55.

[56] Ex. WWW, at PPE 05-12-12 tab.

[57] *Id.* at PPE 07-05-14 tab.

[58] Ex. S. The expense reimbursement Parry claimed with the Labor Commission matches the amount owed to him on GAC's Accounts Payable Aging Summary dated January 15, 2015. *See* Ex. A. Because Parry received or is being paid that amount through the Labor Commission, the expense amount showing on the aging summary will not be considered for purposes of calculating Parry's claim under § 303.

[59] Ex. R. Parry's account includes $2,287.69 in unpaid wages during his time at GBA. That amount will be excluded from the § 303 analysis.

[60] This is largely consistent with GAC's records, which show $27,511.40 in Unpaid Compensation owing to Parry through March 1, 2014. *See* Ex. WWW, at Detail Unpaid Payroll tab. The difference appears to come from a discrepancy between GAC's records and Parry's accounting concerning the pay periods ending January 4 and 18, 2014, but the Court does not view the difference as material to the resolution of this case.

[61] Ex. WWW, at Detail Unpaid Payroll and 2012 Accr Payroll-Reduced Rates tabs.

[62] Ex. VVV, at Unpaid Payroll tab.

### 5. Martie Nadauld

Martie Nadauld began working for GBA in 2008 and continued with GAC post-

Transition. She agreed to a 20% reduction in pay at GBA, but only for a couple of pay periods.[63]

She did not reduce her pay at GAC and therefore did not accrue Deferred or Bonus

Compensation. But Nadauld did accrue $20,081.52 in Unpaid Compensation.[64] She filed a claim

with the Labor Commission for $6,510.46,[65] and received $1,295 under the Payment Plan.[66]

Deducting those amounts from Nadauld's Unpaid Compensation leaves a claim of $12,276.06.

### 6. Scott Carron

Scott Carron had previously worked at GBA from 2006 to 2008, left, then was hired by

GAC in June 2014. As part of his agreement to work at GAC, he was guaranteed a salary of

$115,050, or $4,425 per pay period,[67] and did not agree to defer any compensation. The last pay

check Carron received from GAC was for the pay period ending December 20, 2014, and he was

laid off in January 2015. At the time he was laid off, $59,737.50 of Carron's guaranteed salary

remained unpaid. He later submitted a $10,000 claim to the Labor Commission, which

comprised four weeks of unpaid salary for the pay periods ending January 3 and 17, 2015 as well

as two weeks of paid time off. Carron deducted that $10,000 from the balance of his unpaid

salary and added a $65.38 expense reimbursement claim to arrive at $49,802.88, the claim he

asserted in the amended involuntary petition.

---

[63] Ex. WWW, at PPE 05-12-12 and PPE 06-09-12 tabs.
[64] *Id.* at Detail Unpaid Payroll tab.
[65] Ex. SG55.
[66] Ex. VVV, at Unpaid Payroll tab.
[67] Ex. I.

Carron also applied for unemployment compensation, which began about two months after the 2015 Layoffs. The amount of unemployment compensation Carron received was not introduced into evidence, but Carron made clear that he did not deduct it from his $49,802.99 claim. Even so, such a deduction may not be necessary; there was no evidence suggesting that Carron's receipt of unemployment compensation would reduce GAC's liability, and his claim could be $49,802.99. Assuming, for the sake of argument, that Carron would have to deduct any unemployment compensation he received from his claim, there was still a two-month period from mid-January to mid-March for which he was not compensated through either the Labor Commission or unemployment benefits. Pay periods ending January 31, February 14 and 28, and March 14 would have come due during that period. Multiplying four unpaid pay periods by Carron's compensation of $4,425 per pay period yields $17,700. Adding the $65.38 expense reimbursement claim,[68] but deducting the $567 which Carron received under the Payment Plan,[69] results in a claim of $17,198.38.

### 7. Jacob van der Westhuizen

Jacob van der Westhuizen began working at GBA in April 2000. He held various executive positions in GBA, and he continued as an executive with GAC post-Transition, where he was the Senior Vice President and CTO. Pre- and post-Transition, van der Westhuizen's salary was $130,000 or $5,000 gross pay per pay period.[70] He agreed to reduce his pay 35%

---

[68] Ex. A.

[69] Ex. VVV, at Unpaid Payroll tab. This is consistent with Carron testimony that he received a check for approximately $500 more than a year after the 2015 Layoffs.

[70] *See* Ex. WWW, at PPE 01-07-12 and PPE 01-05-13 Reduced Rates tabs; Ex. Z, at 44 & 53 of 89.

23

beginning in April 2012.[71] That reduction became more drastic at GAC: van der Westhuizen

took an 89% pay cut, receiving $550 per pay period.[72] GAC did not pay van der Westhuizen all

of his salary at the reduced rate, and he accumulated $23,850 in Unpaid Compensation.[73] And

because he reduced his salary substantially, van der Westhuizen is owed $201,800 in Deferred

Compensation and $50,450 in Bonus Compensation.[74]

### 8. Robert Wilson

Robert Wilson joined GBA in September 2001 as an executive and eventually attained

the position of Executive Vice President and COO, which he held at GAC until he left as part of

the 2015 Layoffs. Wilson received a $140,000 salary at GBA,[75] which continued at GAC. He

agreed to a 50% reduction in salary in April 2012,[76] which changed to 94% post-Transition at

GAC.[77] Wilson did not receive all of his salary at the reduced rate, and GAC owes him

$13,569.30 in Unpaid Compensation.[78] As with van der Westhuizen, Wilson substantially

reduced his salary and accrued $256,872.86 in Deferred Compensation and $64,218.22 in Bonus

---

[71] Ex. WWW, at PPE 04-28-12 tab; Ex. Z, at 36 of 89.

[72] Ex. Z, a spreadsheet van der Westhuizen prepared to track amounts owed to him, suggests that his pay remained at 65% of his salaried rate through the 2015 Layoffs. But that is not supported by GAC's Excel spreadsheets. They show a post-Transition reduction to 11% of van der Westhuizen's original rate, *see* Ex. WWW, at PPE 01-05-13 Reduced Rates tab, which is consistent with the payment of $550 per pay period documented in van der Westhuizen's pay stubs. *See* Ex. Z, at 53 of 89. More importantly, the 2012 Accr Payroll-Reduced Rates tab of Ex. WWW documents a change in van der Westhuizen's Deferred Compensation from $1,750 for the pay period ending 11/24/12 to $4,450 for the pay period ending 01/05/13. If van der Westhuizen's pay rate remained at 65% post-Transition but he was only getting paid $550 per pay period, he would be accruing $2,700 in Unpaid Compensation per pay period. But the Detail Unpaid Payroll tab does not show that amount in any post-Transition pay period. Instead, on the occasions when van der Westhuizen was not paid, he accrued $550 in Unpaid Compensation per pay period. The Court finds that Ex. WWW records the correct division between van der Westhuizen's Unpaid and Deferred Compensation.

[73] Ex. WWW, at Detail Unpaid Payroll tab.

[74] *Id.* at 2012 Accr Payroll-Reduced Rates tab.

[75] *See id.* at PPE 01-07-12 tab. Wilson's salary of $5,384.61 per bi-weekly pay period comes out to $139,999.86 per year.

[76] *Id.* at PPE 04-28-12 tab.

[77] *Id.* at PPE 01-05-13 tab.

[78] *Id.* at Detail Unpaid Payroll tab.

24

Compensation.[79] In addition to those amounts, GAC owes Wilson at least $69,099.95 for expenses and loans he made to the company.[80]

### 9. Jason Chen

Jason Chen has asserted a claim of $694,236.50 in the amended petition which consists of three categories: funding he provided to GAC during his time as de facto CEO, unpaid salary, and expenses. With respect to the first category, the evidence is clear that Chen provided substantial funding to GAC.[81] The parties vigorously dispute, however, whether that funding was in the form of loans or equity. Chen wired $516,770 to GAC during 2014,[82] $130,000 of which was an equity investment made by three of Chen's associates, and $20,000 of which was repaid. The remaining sum, $366,770, is the amount Chen alleges that GAC owes him in unpaid loans.

There is conflicting evidence on whether Chen's funds were loans or equity. Chen's and Stevanovich's testimony disagree on this point and so does the documentary evidence. On October 20, 2014, Carolynn Taft sent a brief email to Henry Parry regarding Chen's "stock numbers." The email states that $326,770, which was the amount Chen had wired to GAC prior to that date,[83] was the equivalent of 48,410 shares at $6.75 per share.[84] In addition, Chen wrote an email to Wilson and Taft on November 17, 2014 that stated:

> Slight change of plan. Instead of having all of my investments as equity invest-ment[s] as discussed, Lisa [Chen's wife] and I had a discussion with Steve [Stevanovich] and he promised that the money will be paid back once we are

---

[79] *Id.* at 2012 Accr Payroll-Reduced Rates tab.
[80] Ex. A. The amounts on Ex. A exclude wages and salaries owed to employees. Wilson has not been paid any of the $69,099.95 listed on Ex. A.
[81] *See* Ex. MM. GAC's bank account records show numerous transfers from Chen during 2014.
[82] Ex. LL.
[83] *See* Ex. LL.
[84] Ex. SG35.

funded. So, for now, would you please just issue me $130,000 as equity and leave the rest as a personal loan.

Also, do you have a standard loan document that I can sign just to formally note the amount [that] is being loaned to GAC. A very simple loan would be perfect.[85]

A handwritten note on the printed email deducts $130,000 in "shares" from $456,770, the amount which Chen had wired to GAC up to that date,[86] leaving a balance of $326,770. In apparent response to that email and without Stevanovich's knowledge, the next day GAC drafted a promissory note in the amount of $326,770, payable on demand to Chen.[87] Although Wilson signed the note on behalf of GAC, Chen did not sign it because he believed the amount of the note should have been higher, which seems to contradict the figures in Chen's email and the list of wired payments in Exhibit LL. Chen testified that he later signed an amended note, but he could not find a copy of it, and no amended note was produced at trial. These documents suggest that Chen and GAC were negotiating the status of his advances to the company, and it does not appear that the parties resolved that issue before Chen left GAC.

As regards the second category, Chen asserts that Stevanovich promised him a $280,000 salary with GAC. While Chen worked at GAC for approximately ten months, he and GAC never executed a written employment agreement. On December 14, 2014, after some back-and-forth negotiations with Stevanovich, Chen emailed a proposed employment agreement to Stevanovich, which included a $300,000 salary payable once GAC could raise $5 million in equity.[88]

---

[85] Ex. SG36.
[86] *See* Ex. LL.
[87] Ex. KK.
[88] Ex. SG32.

26

Stevanovich rejected the proposal because it was "not the deal that [they had] discussed."[89] Chen was never paid for his work with GAC.

As regards the third category, Chen claims $94,133.17 in unreimbursed expenses. While GAC has argued that Chen never submitted expense reports or receipts to support this amount, GAC acknowledged in a January 2015 letter that it had received "expense records that we recognize as business expenses and an obligation of the Company" totaling $70,581.74, which GAC owed to Chen and his wife.[90] That amount, however, does not appear on GAC's Accounts Payable Aging Summary dated January 15, 2015.

## III. CONCLUSIONS OF LAW

### A. Section 303

Section 303 imposes two requirements on petitioning creditors seeking entry of an order for relief. First, § 303(b)(1) requires the Petitioning Creditors to show that at least three of them—since GAC has twelve or more creditors—hold claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount, and which together aggregate at least $15,775 in unsecured claims. Second, § 303(h)(1) requires the Petitioning Creditors to show that GAC is generally not paying its debts as they come due unless they are the subject of a bona fide dispute as to liability or amount.

---

[89] *Id.*
[90] Ex. RRR.

**1. Section 303(b)(1): Numerosity of Creditors and Dollar Threshold**

Section 303(b)(1) states:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

GAC has consistently challenged the Petitioning Creditors' standing under § 303(b)(1) by arguing that their claims are either contingent as to liability or the subject of a bona fide dispute as to liability or amount. In pursuing this challenge, GAC has argued that a bona fide dispute as to any amount of a claim would render a creditor ineligible. By contrast, the Petitioning Creditors have taken the position that a creditor has standing under § 303(b)(1) as long as some portion of its claim remains undisputed. The opposing sides of this argument mirror the divergence in case law occasioned by an amendment to § 303(b)(1) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). The Court addressed this dispute in an oral ruling on the Debtor's Motion to Dismiss, and the Court now incorporates that ruling into this decision.

Section 303(b)(1) has undergone two revisions relevant to this case since it was enacted as part of the Bankruptcy Reform Act of 1978. When first enacted, it lacked the requirement that a creditor's claim not be the subject of a bona fide dispute.[91] Congress added that requirement

---

[91] The 1979 text of § 303(b)(1) read:

An involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a

through the Bankruptcy Amendments and Federal Judgeship Act of 1984.[92] The purpose of the

1984 amendment was straightforward: "to prevent creditors from using involuntary bankruptcy

as a club to coerce a debtor to pay debts as to which the debtor, in good faith, had legitimate

defenses."[93] The proponent of the change, Senator Max Baucus, elaborated on the bona fide

dispute requirement as follows:

> The problem can be explained simply. Some courts have interpreted section 303's language on a debtor's general failure to pay debts as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying is a legitimate and good-faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability, but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings.

> My amendment would correct this problem. Under my amendment, the original filing of an involuntary petition could not be based on debts that are the subject of a good-faith dispute between the debtor and his or her creditors. In the same vein, the granting of an order of relief could not be premised solely on the failure of a debtor to pay debts that were legitimately contested as to liability or amount.

> I believe this amendment, although a simple one, is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion. I also believe it corrects a judicial misinterpretation of existing law and congressional intent as to the proper basis for granting involuntary relief.[94]

> The amendment did not define "bona fide dispute," however, so courts set about

articulating a standard for determining whether a claim is in bona fide dispute, sometimes

---

holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

[92] *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117 (2d Cir. 2003), *overruled on other grounds by Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156 (2d Cir. 2010).

[93] *In re Tikijian*, 76 B.R. 304, 314 (Bankr. S.D.N.Y. 1987); *see also Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1, 7 (1st Cir. 2016) ("The self-evident purpose of the no bona fide dispute requirement, as courts have repeatedly recognized, is to prevent creditors from using involuntary bankruptcy to coerce a debtor to satisfy a judgment even when substantial questions may remain concerning the liability of the debtor.") (citations and internal quotation marks omitted).

[94] *In re Henry*, 52 B.R. 8, 9-10 (Bankr. S.D. Ohio 1985) (quoting 130 Cong. Rec. S7618 (daily ed. June 19, 1984) (remarks of Sen. Baucus)).

resulting in disagreement.[95] In time, courts "more or less settled on finding a bona fide dispute

when 'there is either a genuine issue of material fact that bears upon the debtor's liability or a

meritorious contention as to the application of law to undisputed facts.'"[96] Pre-BAPCPA, these

analyses "focused principally on liability issues" regarding the underlying claim.[97] But courts

had also developed a rule whereby a bona fide dispute as to a portion of a petitioning creditor's

claim would not disqualify the creditor under § 303(b)(1) if a portion of that claim was

undisputed.[98]

　　　　Against the backdrop of these developments, Congress amended § 303(b)(1) again in

2005 as part of BAPCPA by adding "as to liability or amount" after "bona fide dispute." The

interpretation of that amendment divided courts into two roughly equal camps.[99] On one side,

some courts have concluded that the BAPCPA amendment substantively changed § 303(b)(1)

and have held that the plain meaning of the statute now requires that a bona fide dispute as to any

amount of a petitioning creditor's claim, no matter how small the amount in dispute, strips the

creditor of standing under § 303(b)(1).[100] On the other, courts have viewed the amendment as

---

[95] *See, e.g.*, *In re Lough*, 57 B.R. 993, 996-97 (Bankr. E.D. Mich. 1986) (rejecting two other courts' bona fide dispute standards and fashioning its own). The *Lough* standard became the progenitor of the objective standard adopted by certain circuit courts of appeal, including the Tenth Circuit. *See Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir. 1991) (adopting the objective test and noting its adoption by other courts).
[96] *In re Fustolo*, 816 F.3d at 6-7 (quoting *In re BDC 56 LLC*, 330 F.3d at 117).
[97] *In re Fustolo*, 503 B.R. 206, 223 (Bankr. D. Mass. 2013), *aff'd* 2015 WL 4876075 (D. Mass. Feb. 17, 2015), *aff'd* 816 F.3d 1 (1st Cir. 2016).
[98] *E.g.*, *IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474, 479 (W.D. Pa. 1995) ("[I]t is clear that if at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to bona fide dispute."), *aff'd* 85 F.3d 612 (3d Cir. 1996); *In re Hentges*, 351 B.R. 758, 776 (Bankr. N.D. Okla. 2006) ("[C]ourts widely held that a dispute as to a portion of a petitioning creditor's claim did not disqualify the creditor as a petitioning creditor under Section 303 of the Bankruptcy Code.").
[99] *In re Fustolo*, 816 F.3d at 9.
[100] *See Montana Dep't of Revenue v. Blixseth*, 581 B.R. 882, 903 (D. Nev. 2017) ("I find that § 303(b), as amended under the BAPCPA in 2005, unambiguously disqualifies a creditor whose claim is the subject of *any* bona fide dispute as to amount."), *appeal docketed*, No. 18-15064 (9th Cir. Jan. 16, 2018); *In re Vicor Techs., Inc.*, No. 12-

30

clarifying prior legislative intent, though not affecting the pre-BAPCPA operation of the statute.[101] This Court agrees with the latter group of cases for two reasons.

First, certain interpretive principles require departure from a strict plain meaning reading of the statute. It is an unquestioned maxim that "interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself,'"[102] and it is also true that where the language of the statute is clear, "the sole function of the courts is to enforce it according to its terms."[103] But "[w]hen Congress enacts legislation, it is presumed to act with knowledge of the existing law and judicial concepts,"[104] and "[w]hen Congress amends the bankruptcy laws, it does not write on a clean slate."[105] In particular, "[p]re-BAPCPA bankruptcy practice is telling because [courts] 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'"[106] As applied to § 303(b)(1), these interpretive principles suggest that BAPCPA did not alter the operation of the statute.

---

39329-EPK, 2013 WL 1397460, at *5 (Bankr. S.D. Fla. Apr. 5, 2013) ("[A] dispute as to any portion of a claim, even if some dollar amount would be left undisputed, means there is a bona fide dispute as to the amount of the claim and such claim cannot be counted to satisfy § 303(b)(1).").

[101] *See In re Miller*, 489 B.R. 74, 82 (Bankr. E.D. Tenn. 2013) ("[T]he court does not agree that post-BAPCPA § 303(b) requires an all-or-nothing analysis: that the statutory language 'as to liability or amount' should be read as meaning that any dispute as to any portion of the amount of a claim owed disqualifies a creditor from being a petitioning creditor."); *In re Tucker*, No. 5:09-bk-914, 2010 WL 4823917, at *6 (Bankr. N.D. W. Va. Nov. 22, 2010) ("The better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide dispute exists regarding a *portion* of its claim.").

[102] *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

[103] *Ron Pair Enters., Inc.*, 489 U.S. at 241 (citation and internal quotation marks omitted).

[104] *In re VistaCare Grp., LLC*, 678 F.3d 218, 226 (3d Cir. 2012) (citation and internal quotation marks omitted).

[105] *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) (citation and internal quotation marks omitted).

[106] *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 454 (2007)).

When Congress amended § 303(b)(1) in 1984, it struck a balance between the ability of petitioning creditors to have access to the bankruptcy courts and the interest of would-be debtors to remain free from involuntary petitions filed by creditors whose claims were legitimately disputed. To read the BAPCPA amendment as disqualifying a creditor where any amount of its claim is disputed would be to noticeably shift that balance by dramatically restricting creditors' access to the bankruptcy courts through an involuntary petition.[107] This would amount to a significant change in pre-BAPCPA practice, but there is simply no "clear indication that Congress intended such a departure." As one court observed:

> With the dearth of committee comments and legislative history available to interpret BAPCPA, this Court cannot presume that Congress added the phrase "as to liability [or] amount" with the intent that the claims of involuntary petitioners must now be fully liquidated either by agreement or judgment so that no dispute exists as to any portion of such claims. Without clear legislative intent, this Court cannot presume such a change in the law and declines to do so.[108]

Because there is not a clear indication that Congress intended to institute a change that would significantly shift the debtor-creditor balance existing in pre-BAPCPA practice, the Court agrees with *DemirCo*, *Collier's*, and other similar authorities that "the better view is that the 2005 amendments do not change the analysis."[109]

Second, to the extent that these interpretive principles do not require departure from a strict plain meaning reading of the statute, viewing the BAPCPA amendment as disqualifying a petitioning creditor if even a small portion of its claim is disputed would lead to an absurd

---

[107] *See* 2 Collier on Bankruptcy ¶ 303.11[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[D]isqualifying a creditor because a *portion* of its debt is in dispute could curtail the ability of creditors to resort to a remedy Congress intended them to have.").

[108] *In re DemirCo Holdings, Inc.*, No. 06-70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. June 9, 2006).

[109] 2 Collier on Bankruptcy ¶ 303.11[2].

32

result—one "so bizarre that Congress could not have intended it."[110] To illustrate such a result, a

court posed the following hypothetical: suppose a petitioning creditor had a claim of $100,000

and of that amount, $99,900 was undisputed and only $100 was subject to a bona fide dispute.[111]

The court stated that disqualifying such a creditor would be absurd,[112] and while this Court

recognizes the rarity with which the absurdity doctrine should be invoked,[113] this appears to be

an instance where "the literal application of a statute will produce a result demonstrably at odds

with the intentions of its drafters."[114] To be sure, the example in *In re 3 Man Corp.* is extreme,

but it is the logical and necessary conclusion of reading the statute literally. A strict plain

meaning interpretation of § 303(b)(1) would disqualify many petitioning creditors, including

those whose claims were undisputed except for a small, inconsequential amount. *Collier's*

puzzled over why Congress could intend such a result:

> Why would Congress want to disqualify a creditor whose claim is noncontingent
> and at least partially *un*disputed? Section 303's requirements regarding type and
> number of claims are an attempt to balance a debtor's interest in staying out of
> bankruptcy with the interest of creditors in putting a debtor into bankruptcy. Why
> shouldn't the undisputed, noncontingent portion of a petitioning creditor's claim
> count? Why disqualify the creditor in toto? Why effectively bar that creditor's
> access to the bankruptcy forum?[115]

Because it does not appear that Congress intended to significantly limit the availability of an

involuntary petition, the Court will not read the BAPCPA amendment to effect that change. A

bona fide dispute as to some amount of a creditor's claim will not disqualify the creditor so long

---

[110] *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 190-91 (1992)).

[111] *In re 3 Man Corp.*, No. 5-12-bk-00879-JJT, 2014 WL 4346747, at *4 (Bankr. M.D. Pa. Aug. 29, 2014) (quoting 2 Bankruptcy Litigation § 11:10).

[112] *Id.*

[113] *See Robbins*, 435 F.3d at 1241-43 (providing an overview of the application of the absurdity doctrine).

[114] *Ron Pair Enters., Inc.*, 489 U.S. at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

[115] 2 Collier on Bankruptcy ¶ 303.11[2].

as there is some portion of its claim that is not in bona fide dispute and which, along with the other undisputed portions of the other petitioning creditors' claims, meets the statutory dollar threshold of § 303(b)(1).

Having addressed the effect of a bona fide dispute, the Court next turns to how one is determined. Tenth Circuit precedent requires that there be an "objective basis for either a factual or legal dispute as to the validity of [the] debt" in order to conclude that the debt is the subject of a bona fide dispute.[116] "The court need not determine the probable outcome of the dispute, but merely whether one exists."[117] But "[t]his does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists."[118] "Once the petitioning creditor establishes a prima facie case that its claim is not subject to a bona fide dispute, the burden shifts to the debtor to present evidence of a bona fide dispute. Under this objective approach, the debtor's subjective intent does not control whether a claim is considered to be subject to a bona fide dispute."[119]

GAC has disputed many aspects of the Petitioning Creditors' claims but based on the findings of fact, the Court concludes that many of these disputes are not bona fide. With respect to whether GAC owes Deferred and Bonus Compensation, the Court concludes that the Petitioning Creditors carried their burden based on testimony and documentary evidence that

---

[116] *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988).
[117] *Id.*
[118] *In re Rimell*, 946 F.2d at 1365; *see also In re TPG Troy, LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y. 2013) ("[T]he court may address the merits of the dispute" in determining the presence of a bona fide dispute.), *aff'd*, 793 F.3d 228 (2d Cir. 2015).
[119] *Bartmann*, 853 F.2d at 1544 (citations omitted).

34

non-executive employees were entitled to such compensation. But after viewing the evidence objectively, GAC did not carry its burden to demonstrate a bona fide dispute on this issue. Accordingly, the Court will count Deferred and Bonus Compensation for purposes of § 303.

In addition, GAC has argued that choosing to file a claim with the Labor Commission is an election of remedies and that Carron, Nadauld, and Parry have waived any entitlement to the balance of Unpaid Compensation over the amounts they received in the Labor Commission judgments. GAC relies on Utah Code Ann. § 34-28-9.5 for its election of remedies argument. In brief, that provision informs employees whether they can file an action for unpaid wages in district court or whether they must use the Labor Commission. Employees with wage claims less than or equal to $10,000 must first pursue administrative remedies, while those with claims above $10,000—and those with claims under that amount subject to certain exceptions—may file in the district court in the first instance. But the statute does not preclude employees with claims over $10,000 from filing with the Labor Commission, and it does not bar recovery of amounts over that threshold. Carron's judgment from the Labor Commission likewise does not support GAC's election of remedies argument. It states that Carron filed a wage claim "for work that he performed for [GAC] during the period of December 21, 2014 to January 20, 2015."[120] The judgment expressly circumscribes Carron's claim with the Labor Commission to a defined time period, but it does not mention wages he might have earned outside those dates. Nor does it state that a wage claimant forgoes wages not pursued with the Labor Commission. The judgment's language, along with that of the statute, suggests a wage claimant is free to pursue

---

[120] Ex. N.

wages not within the Labor Commission's purview. Accordingly, Carron, Nadauld, and Parry are not limited to the amounts sought through the Labor Commission, and Utah Code Ann. § 34-28-9.5 does not create a bona fide dispute regarding their claims.

With respect to GAC's liability for the debts of GBA: The Petitioning Creditors did not carry their prima facie burden to show the absence of a bona fide dispute on this point. GAC is a separate legal entity and did not assume the debts of GBA. Evidence that GAC has likely been paying some of GBA's unpaid compensation under the Payment Plan does not establish GAC's liability for those debts. Accordingly, the Court finds that there is a bona fide dispute on this issue and, as a result, none of GBA's debts, including compensation earned but unpaid from an employee's time at GBA, will be counted for purposes of § 303.

GAC has also argued that many of the Petitioning Creditors' claims are the subject of a bona fide dispute because they were not approved by its board of directors. The Court has found, however, that the board effectively ceded authority over the approval of loans and expenses and other matters to the company's executives. Having ceded such authority, GAC's attempt to stand on ceremony and dispute its obligation to repay amounts simply because the board did not approve those amounts is unavailing. The Court concludes that the board's failure to approve a loan or expense does not render it subject to a bona fide dispute.

As regards Kent's claim, GAC has maintained that it is subject to a bona fide dispute as to liability and amount based on the following grounds: first, GAC and Kent never entered into a lease; second, GAC never assumed or received the lease as part of the Transition; third, GBA, which remained in existence after the Transition, continued to use space in the leased premises;

36

and fourth, some of the rent charges in Kent's claim predate GAC's occupancy of the

property.[121] The Court does not find any of these grounds compelling because GAC was

responsible for rent payments, and the charges allocable to GAC's occupancy can be readily

determined.

When the fourth amendment to the lease expired on September 30, 2012 and Kent

continued to accept rent payments, GBA became a tenant at will,[122] just as it had when the third

amendment expired without extension on December 1, 2010.[123] After the Transition, GAC

continued the operations of GBA in the same space, with the same employees, and with the same

corporate mission. While GBA existed as a legal entity and held shares of GAC stock, it had no

operations post-Transition. This arrangement suggests that GAC, as the operating corporate

entity, in effect became a tenant at will and took over the responsibility to make rent payments.

And that is precisely what happened. Groen testified that GAC paid rent for the West California

Avenue property, which is supported by GAC's records and course of conduct. The clearest

piece of evidence is GAC's Accounts Payable Aging Summary dated January 15, 2015, which

lists a debt owing to Kent of $177,763.61.[124] It is not credible to maintain that GAC does not

owe rent when its own aging summary lists that very same rent obligation. In addition, GAC

wrote Kent a letter in December 2014 after it had moved out of the West California Avenue

property, which provided GAC's updated address, phone number, and website and informed

Kent that GBAG had changed it name to GAC. Critically, the letter stated that despite the name

---

[121] Dkt. No. 145, at 6.
[122] *See Evershed v. Berry*, 436 P.2d 438, 440 (Utah 1968) ("If nothing more is shown than payment and receipt of rent, the result at common law is the creation either of a tenancy at will or at most of one from year to year.").
[123] *See* Ex. C.
[124] Ex. A. The entry in the aging summary is "California Ave," which refers to the property GAC rented from Kent.

change, "[a]ny outstanding obligations by GBAG remain the responsibility of GAC."[125] If GAC owed no rent, there would be little reason to send a letter to Kent that essentially told him that he could seek payment of GBAG's debts from GAC at a new address. After viewing the evidence objectively, the Court concludes that there is no bona fide dispute regarding GAC's liability for post-Transition rent to Kent. The fact that GAC did not have a signed lease agreement with Kent does not create an objective basis to dispute Kent's claim because GAC was a tenant in the premises and had assumed responsibility for rent.

There is also no objective basis to dispute the amount of Kent's claim. While the amounts GAC paid to Kent were initially credited against delinquent rent owed by GBA, it appears that GBA's outstanding balance was paid off around October 2014. That month GAC sent a letter to Kent informing him that the security deposit paid by GBA under the 1997 lease could be "applied toward payment of rent due."[126] There would be no need to clarify that funds deposited by GBA could be used to satisfy debts of GAC if GBA still owed rent. This suggests that the amount owing to Kent in GAC's aging summary—which is dated after the letter—consists entirely of post-Transition rent. And that's corroborated by Kent's invoice. Kent assessed $284,817.01 in post-Transition rent, and GAC made over $94,000 in payments that were allocated solely against that sum, leaving a balance of $190,172.65 in post-Transition rent. Because the amount listed in the aging summary is lower than that in the invoice, the Court concludes that there is no bona fide dispute that GAC owes at least $177,763.61 in post-Transition rent to Kent. That amount is not contingent as to liability.

---

[125] Ex. G.
[126] Ex. F. T

38

The Court concludes that the claims of van der Westhuizen and Wilson are also not in bona fide dispute. GBA and GAC carefully recorded the amounts they were owed, and there is no objective factual or legal basis to vary from those numbers. Based on GAC's Excel spreadsheet, the Court concludes that van der Westhuizen's undisputed claim is $276,100. As for Wilson, his undisputed claim is $403,760.33, composed of $334,660.38 in Unpaid, Deferred, and Bonus Compensation, and $69,099.95 in expenses and loans. GAC has asserted that Wilson's and van der Westhuizen's compensation should not be counted under § 303(b)(1) because reimbursement of executives is contingent on GAC obtaining sufficient cash flow to pay those claims, as determined by GAC's board. In response, the Petitioning Creditors have argued that such an arrangement runs afoul of Utah Code Ann. § 34-28-3(6)(b), which requires that an employee expressly authorize any withholding of wages in writing, and it is undisputed that Wilson and van der Westhuizen did not execute such a writing. The Court does not need to resolve this legal issue or the factual issue regarding board approval because the Petitioning Creditors can satisfy § 303(b)(1) with other creditors whose non-contingent, undisputed, unsecured claims exceed $15,775. The Court does conclude, however, that Wilson's $69,099.95 expense and loan claim is non-contingent and not in bona fide dispute and should be counted in the § 303(b)(1) analysis.

The Court concludes that all three categories of Chen's claim are in bona fide dispute. The evidence on whether his contributions were loans or equity is conflicting, and there is an objective basis to dispute if GAC is obligated to repay Chen for his contributions. Chen's salary claim is not supported by a signed employment agreement, and he and Stevanovich appear to

have disagreed on the terms of his employment, so there is an objective basis to dispute what he

was owed in salary. And Chen's expense claim, while partially documented in a letter, does not

appear in GAC's aging summary, in contrast to other expense claims. Accordingly, there is an

objective basis to dispute that claim.

Based on the foregoing findings of fact and conclusions of law, the Court concludes that

these Petitioning Creditors have unsecured claims in at least the following amounts that are not

contingent as to liability and not the subject of a bona fide dispute as to liability or amount:

1. Howard Kent: $177,763.61.

2. Lori Chigbrow: $8,885.91.

3. Carolynn Taft: $2,716.19.

4. Henry Parry: $41,135.03.

5. Martie Nadauld: $12,276.06.

6. Scott Carron: $17,198.38.

7. Robert Wilson: $69,099.95.

Because there are at least three petitioning creditors whose non-contingent, undisputed,

unsecured claims exceed $15,775, the Court concludes that the Petitioning Creditors have

satisfied the requirements of § 303(b)(1).

## 2. Section 303(h)(1): Generally Not Paying Debts as They Come Due

Having found that the Petitioning Creditors have met the numerosity and dollar threshold

requirements of § 303(b)(1), the Court turns to § 303(h). Under that subsection, the Petitioning

Creditors bear the burden to show by a preponderance of the evidence that the debtor is generally

40

not paying its debts as they become due.[127] That determination is made as of the filing date.[128] If

the Petitioning Creditors carry their burden, "the burden shifts to the debtor to show that the

debts in question are subject to a bona fide dispute."[129] Importantly, and unlike § 303(b)(1),

§ 303(h) contains no provision that excludes consideration of contingent debts.

Though it doesn't endorse a specific set of factors, *Bartmann* prescribes a totality of the

circumstances test under § 303(h)(1), and the 10th Circuit BAP has characterized this test as a

"flexible case-by-case approach" that permits a bankruptcy court "to receive and consider all

admissible evidence presented, the demeanor and credibility of the witnesses, and argument of

counsel [in determining] whether the creditor has met its burden."[130] In addition, the BAP stated

that the use of the word "generally" in § 303(h)(1) was meant to indicate that courts should use a

totality of the circumstances test and eschew mechanical tests.[131] The Court notes, however, that

some decisions involving § 303(h)(1) have begun with or included what is characterized as a

mechanical or mathematical test, which can be supplemented with other factors or analyzed in

conjunction with a broader totality test.[132]

---

[127] *Id.* at 1546.

[128] *Id.*

[129] *Soc'y at Lloyd's v. Harmsen (In re Harmsen)*, 320 B.R. 188, 197 (10th Cir. BAP 2005).

[130] *Id.* at 198. While the BAP approved of the bankruptcy court's consideration of certain factors in applying the totality of the circumstances test, it did not expressly endorse such factors for use in future cases.

[131] *See id.* (citing *In re All Media Properties, Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980)).

[132] *See In re Agrawal*, 562 B.R. 510, 515-18 (Bankr. W.D. Okla. 2016) (applying the mathematical and totality of the circumstances tests); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 630-33 (Bankr. N.D. Okla. 2005) (same). The labels courts have affixed to the mathematical and totality tests are not consistent, however. In fact, some courts have described the same test as a totality inquiry while others have called it mechanical. *Compare In re Huggins*, 380 B.R. 75, 83 (Bankr. M.D. Fla. 2007) ("The courts apply a flexible totality of the circumstances test in determining whether a debtor is 'generally not paying' his debts, which focuses on the number of unpaid claims, the amount of the claims, the materiality of nonpayment and the overall conduct of the debtor's financial affairs."), *with In re Agrawal*, 562 B.R. at 515 ("[T]he second step of the [mechanical] inquiry . . . requires the court to compare the number and amount of unpaid debts with the number and amount of paid debts. That comparison is to take into

This is the approach the Court will take. While the BAP has counseled against mechanical tests, that proscription appears aimed more at rigid mathematical formulas that fail to account for the particular circumstances of a case.[133] What some courts have characterized as a "mechanical" test in fact falls well within the broad *Bartmann* framework, which permits the Court to "consider all admissible evidence presented." A good amalgamation of the totality and so-called mechanical tests, which this Court adopts, is found in *In re Quinto & Wilks, P.C.*:

> Generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments that are significant in amount in size to the debtor's operation. Where the debtor has few creditors, the number which will be significant will be fewer than when the debtor has a large number of creditors. Also the amount of debts being paid is important. If the amounts missed are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper. Determining that a debtor is generally not paying his debts requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts. A court must compare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the nonpayment, and the nature of the debtor's conduct of its financial affairs. A starting point in the inquiry is to employ what is termed the mechanical test which is composed of five factors: the timeliness of payments on past due obligations; the amount of debts long overdue; the length of time during which the debtor has been unable to meet large debts; any reduction in the debtor's assets, and the debtor's financial situation. In the final analysis, the determination whether an alleged debtor is generally not paying his or her debts as they become due is a flexible one which admits no hard and fast rules, and requires a careful balancing of both the number and amount of the unpaid debts, in proportional terms, viewed in the light of the alleged debtor's total financial picture.[134]

---

[133] *See* 2 Collier on Bankruptcy ¶ 303.31 ("There is no single mathematical formula that can be used to determine whether the ['generally not paying'] standard has or has not been met.").

[134] *In re Quinto & Wilks, P.C.*, 531 B.R. 594, 609 (Bankr. E.D. Va. 2015) (citations and internal quotation marks omitted).

account the materiality of that nonpayment as well as a debtor's general conduct of its financial affairs."). The Court does not need to resolve this semantic argument, however.

Whether a debtor defers payment on certain debts, such as employee salaries or wages, in order

to pay other debts is a relevant consideration.[135] In addition, the length of time debts have gone

unpaid is also relevant,[136] but the fact that a petitioning creditor has not demanded payment or

pursued collection before joining the involuntary petition is not.[137]

A company's accounts payable aging reports are a good place to begin the § 303(h)(1)

inquiry.[138] But GAC claims not to have kept traditional accounting records after the 2015

Layoffs, and no accounts payable aging reports contemporaneous with the filing date were

introduced into evidence. Instead, GAC tracked its expenses and payments using invoices and

bank statements.[139] GAC's bank statements and those of GAC Unmanned Aircraft Systems, Inc.,

its wholly-owned subsidiary, were introduced into evidence,[140] as were contemporaneous

invoices,[141] though neither side elicited testimony regarding the invoices. Importantly, Exhibit

SG54 appears to be a selection of invoices rather than a comprehensive collection of them, so it

is not possible on this record to develop a complete picture of GAC's invoice payments around

the filing date. Nevertheless, a comparison of the selected invoices and the relevant bank

statements shows that GAC was, for the most part, paying its invoices in full on average roughly

---

[135] *See In re CorrLine Int'l, LLC*, 516 B.R. 106, 160 (Bankr. S.D. Tex. 2014).

[136] 2 Collier on Bankruptcy ¶ 303.31[2] (citing *In re Everett*, 178 B.R. 132, 139 (Bankr. N.D. Ohio 1994)).

[137] *In re Int'l Oil Trading Co.*, 545 B.R. 336, 358 (Bankr. S.D. Fla. 2016); *see also In re West Side Cmty. Hosp., Inc.*, 112 B.R. 243, 256 (Bankr. N.D. Ill. 1990) ("Mere failure of a creditor to demand payment of a debt does not excuse failure to pay it."); *In re Win-Sum Sports, Inc.*, 14 B.R. 389, 392-93 (Bankr. D. Conn. 1981) ("A debt is no less due because a creditor has seen fit for a time to forebear in collecting it.").

[138] *See In re CorrLine Int'l, LLC*, 516 B.R. at 159 (starting the § 303(h)(1) inquiry by looking at the debtor's accounts payable aging report).

[139] The Petitioning Creditors note that Stevanovich alluded to a spreadsheet during his cross-examination, which, they argue, shows the existence of more detailed accounting records that were not produced during discovery. But Stevanovich's testimony only indicated that the spreadsheet was used to keep track of its outstanding debts, and there was no indication that it was anything more complex than that.

[140] Exs. TT & SS, respectively.

[141] Ex. SG54.

30 days after the date of the invoice around the time the involuntary petition was filed.[142] The

lone conspicuous exception appears to be the City of Buckeye, AZ, in which GAC rented a

hangar. An invoice dated September 15, 2017 lists a past due balance of $11,418.47, which

includes a current charge of $871.25.[143] It is not clear whether the current charge represented a

monthly obligation, but the evidence suggests that the past due balance accumulated over several

months. As far back as March 2017, GAC was already repaying a portion of a past due balance,

which it continued to do in April and June.[144] Even so, the past due balance owing to the City of

Buckeye around the filing date was not a significant unpaid debt within the context of GAC's

operations in September 2017; during that month GAC spent $212,942.28. In addition to the

invoices, the bank statements show that GAC was paying wages to employees as well as

employment taxes, though it is not clear whether these amounts were being paid in full. While

the picture is perhaps incomplete, it appears that GAC was generally paying its current debts as

they came due at the time this case was filed.[145]

But GAC has substantial, years-old debt owing to at least 19 current and former

employees, including some of the Petitioning Creditors, as well as debt owing to Kent. GAC

---

[142] Some creditors were paid more quickly while others took longer to receive payment. For example, among
creditors with multiple invoices in Ex. SG54, General Michel's three invoices were paid on average 12 days after
the invoice date. By contrast, GAC paid two invoices for Nathan W. Drage, P.C. on average 66 days after the
invoice date. This disparity in payment time is not material to the Court's analysis, however.

[143] Ex. SG54, at SKYWORKS000060.

[144] Ex. TT, at SKYWORKS000715, 000721, 000728.

[145] Ex. BBBB is not to the contrary. The table shows $247,000.27 in outstanding liabilities, but GAC's bank
statements indicate that most of those debts were paid in full or in substantial part during the following month.
Accordingly, the table supports the conclusion that GAC was generally paying its current debts as they came due.
The Petitioning Creditors have focused on $4,456.21 in unpaid COBRA and FSA plan administration fees from
2015 as well as $58,400 owing to the Utah Office of State Debt Collection as evidence that GAC was generally not
paying its debts as they came due. Since these debts were incurred long before the filing date, they do not change the
Court's conclusion regarding GAC's payment of current debts. But those unpaid debts will be considered in the next
portion of the Court's analysis.

owes $258,708.54 in post-Transition Unpaid Compensation,[146] at least $67,831.11 of which was paid before this case was filed under the Payment Plan,[147] as well as $2,301,694.73 in Deferred Compensation and $575,423.68 in Bonus Compensation, none of which has been paid.[148] In addition, GAC's Accounts Payable Aging Summary dated January 15, 2015, which excluded wages and salary owed to employees, shows that GAC had $1,036,563.74 in outstanding expenses as of that date.[149] It is not clear how much, if any, GAC has paid of that amount, but it is clear that the $177,763.61 owed to Kent, the $48,228.31 owed to Groen, the $69,099.95 owed to Wilson, and the small expense claims of Taft and Carron have not been paid. GAC also owed $35,799.73 on the Labor Commission judgments and $4,456.21 in unpaid COBRA and FSA plan administration fees from 2015.[150] Adding those amounts to the total Unpaid, Deferred, and Bonus Compensation shows that GAC owed approximately $3.4 million in aged debt when this case was filed.

Most of this debt started accruing in December 2012 as a result of austerity measures that began at GBA and continued post-Transition at GAC until the 2015 Layoffs. And except for paying a portion of Unpaid Compensation under the Payment Plan and some of the Labor Commission judgments pursuant to an agreement with the state, GAC appears to have devoted no resources towards its repayment between the 2015 Layoffs and the filing date. Admittedly, GAC foundered after the 2015 Layoffs and was not immediately able to repay any of these debts.

---

[146] *See* Ex. WWW, at Detail Unpaid Payroll tab.

[147] *See* Section II.E.

[148] *See id.* at 2012 Accr Payroll-Reduced Rates tab. Over 98% of the Deferred and Bonus Compensation is attributable to executive salaries, the payment of which, GAC has argued, is subject to the approval of its board. But as mentioned previously, contingent debts are included in the § 303(h)(1) analysis.

[149] Ex. A.

[150] Ex. BBBB.

Its bank account stood at $1,800 by the end of January 2015 and declined to $205 in April.[151]

But when GAC received approximately $5 million in funding in December 2016, it largely

continued to ignore these obligations. Instead, GAC used this funding to make substantial and

regular payments to a variety of entities during 2017. For example, GAC made at least seven pre-

petition payments totaling $141,355 to Mungo Creative Group, Inc., a social media company

whose duties include composing press releases for GAC, handling its Twitter feed, and keeping

up its social media presence; three payments totaling $113,000 to Seven Ply Maple, a media

company hired to make computer-generated videos of GAC's designs; and seven payments

totaling $91,868.70 to Albright Stonebridge, a Washington, DC law firm used to find contacts in

the aviation industry.[152] Payments to these and other entities constitute a significant portion of

GAC's expenses, but there was no evidence that such payments were reasonably calculated to

bring gyroplanes to market.[153]

The bank statements belonging to GAC and its wholly-owned subsidiary provide a more

complete view of GAC's spending and total financial picture. In December 2016, $4,993,290.77

---

[151] Ex. TT, at SKYWORKS000605 & 000613.

[152] *Id.* at SKYWORKS000688-765. Ex. CCCC, a demonstrative exhibit prepared by the Petitioning Creditors, summarizes these payments and payments to other entities, including post-petition payments.

[153] GAC has essentially argued that it was necessary to spend money in this way—that is, it had to use its finite resources in such a way as to maximize the chances that the company would become operationally viable, and devoting those resources to the repayment of old debts would diminish those chances. This "necessity" argument is not an express factor in the § 303(h)(1) analysis, and perhaps with good reason—if the debtor is in such financial difficulty that it must rob Peter to pay Paul, it's likely that the debtor is generally not paying its debts as they come due. But because the totality test is flexible, looks at the debtor's total financial picture, and considers all admissible evidence presented, the Court will not preclude the possibility that this defense could be considered in exceptional cases.

This argument would have to arise as part of a burden-shifting framework, however. If a petitioning creditor has carried its burden to show that the debtor was generally not paying its debts as they came due, it would then be the debtor's burden to prove that the allocation of resources was necessary. Even if this were an exceptional case, GAC did not carry its burden to show that it was necessary to spend the amount of money it did on the services it purchased. Accordingly, the Court will not consider this argument in its § 303(h)(1) analysis.

46

was deposited into GAC Unmanned Aircraft Systems, Inc.'s bank account, which GAC uses as a

holding account. GAC started receiving transfers from that account in January 2017, and it

received a total of $2,138,592.80 during 2017, an average of $178,216.06 per month. Those

transfers left $2,854,697.97 in the subsidiary's bank account by the end of that year. Through the

first four months of 2018, GAC received $835,724.81 from its subsidiary, or $208,931.20 per

month.[154] For the 16-month period from January 2017 to April 2018, GAC received an average

of $185,894.85 per month, and it appears to have consumed that cash at a roughly equivalent

rate. At the beginning of January 2017, prior to the first transfer from the subsidiary, GAC's

bank account balance was $120,413.54. At the end of April 2018 it was $134,213.03, suggesting

that nearly all of the cash transferred to it by the subsidiary was spent in the operation of the

business.[155]

These numbers show that the $3.4 million in aged debt was significant relative to the size

of GAC's operation around the filing date. No other debt was a fraction as large, but GAC

devoted far less to it than its current debts. While GAC was spending $185,894.85 per month on

average in 2017, it allotted just $4,214 to the repayment of Unpaid Compensation and $2,250 to

Labor Commission claims in September 2017.[156] And even though the Payment Plan was in

effect for 17 months prior to the filing date, GAC paid $67,831.11, or approximately 2% of the

total $3.4 million in debt.

---

[154] *See* Ex. ZZZ.
[155] A review of GAC's bank statements shows that it does not appear to have had material sources of funding during this time other than the transfers from its subsidiary's bank account.
[156] Ex. SG55.

These numbers also show a significant reduction in GAC's assets. Although GAC's expenditures continued, it was not generating any revenue at the time this case was filed to offset its outlays. By the end of April 2018, the most recent month for which a bank statement was introduced into evidence, the subsidiary's bank account was down to $2,018,973.16.[157] Stevanovich testified that the subsidiary had about $1.5-$2.0 million in its bank account at the time of trial, but the account was already at the upper limit of that estimate five months earlier. Assuming transfers to GAC continued through September 2018 in the same average amount of $185,894.85 per month, the subsidiary's account would be down to $1,089,498.91 by the end of September 2018. There was no evidence that new funds have been placed in the subsidiary's bank account.

In sum, as of the petition date GAC was expending substantial amounts of money but it had largely deferred payment on $3.4 million in long-overdue debt, which it had not significantly reduced in the over two-and-a-half years between the 2015 Layoffs and the filing date. Moreover, GAC's expenditures were steadily depleting its cash reserves, which were not being replenished with new revenue. Despite paying its current debts on time, GAC placed $3.4 million in aged debt on the back burner, and this choice leads the Court to conclude that GAC was generally not paying its debts as they came due when the case was filed. That conclusion shifts the burden to GAC to demonstrate that the debts at issue are the subject of a bona fide dispute, but because the Court has already concluded that they are not, it is not necessary to

---

[157] Ex. ZZZ, at SKYWORKS000844.

repeat that analysis. Having met their burden under § 303(h)(1), the Court concludes that the

Petitioning Creditors have satisfied the statutory requirements of § 303.

## B. GAC's Motion to Dismiss for Bad Faith

The Court will now address GAC's motion to dismiss the involuntary petition because it

was filed in bad faith.[158] The Tenth Circuit has not ruled on the legal issue of whether an

involuntary petition can be dismissed on bad faith grounds even if the requirements of § 303

have been met, but a handful of other courts, including one circuit court, have held that it can be

so dismissed.[159] The Court does not need to decide that legal issue, however, because even if it

followed the rule of *Forever Green*, the Court concludes that the petition was not filed in bad

faith.

At the outset, an involuntary petition enjoys a presumption of good faith, and the debtor

bears the burden to show by a preponderance of the evidence that the filing was in bad faith.[160]

While courts have created a panoply of tests to evaluate whether an involuntary petition was

filed in bad faith,[161] the Court agrees with *Forever Green* that the proper test to use in evaluating

bad faith is the totality of the circumstances. Not only is it "most suitable for evaluating the

myriad ways in which creditors filing an involuntary petition could act in bad faith,"[162] it also is

---

[158] GAC's motion to dismiss alleges a number of other grounds to dismiss the petition, including that the Petitioning Creditors lack standing and their claims are the subject of bona fide disputes. Because the Court has addressed those issues in the context of § 303(b) and (h), only the bad faith argument remains. *See* Docket Nos. 40, 71, and 89.

[159] *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015) (collecting cases). *But see Marciano v. Chapnick (In re Marciano)*, 708 F.3d 1123, 1129 (9th Cir. 2013) ("The Bankruptcy Code does not expressly provide for dismissal of an otherwise proper involuntary petition because of the subjective 'bad faith' of the filers.").

[160] *Id.* at 335 (citations omitted); *see also* 2 Collier on Bankruptcy ¶ 303.16.

[161] *See* 2 Collier on Bankruptcy ¶ 303.16[1] (listing six developed tests).

[162] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336.

the test that the Tenth Circuit applies to other bankruptcy questions involving good or bad faith

and would likely adopt in this context.[163]

> In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.[164]

GAC's bad faith argument is based on the improper purpose and improper use tests,[165] which are

two of the six bad faith tests mentioned in *Collier's*. Those tests are not contrary to the totality

test, but instead have been incorporated into it through the factors regarding the motivation for

the filing and whether the petitioning creditors are taking a disproportionate advantage for

themselves.[166] Because those two tests are now reduced to factors, however, they alone do not

---

[163] *See, e.g., Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314, 1318 (10th Cir. 2012) (using a totality of the circumstances test to determine if a chapter 13 plan has been proposed in good faith); *Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993) ("[I]n determining whether a Chapter 13 petition has been filed in bad faith under § 1307(c), the bankruptcy court must consider the 'totality of the circumstances.'").

[164] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336.

[165] *See* Alleged Debtor's Trial Brief, Dkt. No. 145, at 9.

[166] *See Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501 (11th Cir. 1997) ("Some courts have established an 'improper purpose test,' under which bad faith exists where the filing of the petition was motivated by ill will, malice or the purpose of embarrassing or harassing the debtor."); *In re Basil St. Partners, LLC*, 477 B.R. 846, 852 (Bankr. M.D. Fla. 2012) ("[T]he 'improper purpose' test [asks whether] the petitioning creditors were motivated to file the petition out of ill will or malice, or in order to harass or embarrass the debtor."); 2 Collier on Bankruptcy ¶ 303.16[1] ("[The] 'improper use' test . . . looks at whether the creditor's conduct takes disproportionate advantage of other creditors."); *In re Smith*, 243 B.R. 169, 194 (Bankr. N.D. Ga. 1999) ("The 'improper use' test finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum.") (citation omitted).

determine the Petitioning Creditors' good or bad faith. Moreover, although the filing of an

involuntary petition without first pursuing non-bankruptcy collection remedies was generally

regarded as a species of improper use of the Code that would support a finding of bad faith,[167]

that too is now just one factor among many. In its motion, GAC has emphasized that the

Petitioning Creditors have largely bypassed normal collection procedures and has argued that

Chen had improper motives and the remaining Petitioning Creditors had different, but also

improper, motives. But because the Court is applying the totality test, the evidence regarding

these claims must be viewed against a broader set of facts and circumstances.

Regarding Chen's motivations, GAC's theory of the case is that Chen orchestrated this

involuntary petition with the nefarious aim of forcing GAC into bankruptcy, depressing its value,

and acquiring its assets at rock-bottom prices or, at the very least, using the threat of bankruptcy

to leverage a settlement of his claim.[168] GAC also asserts that Chen paid or guaranteed the other

Petitioning Creditors' legal fees, implying that he persuaded them to join the petition solely as

pawns to clear the § 303 statutory hurdle, after which time he would pursue his asset-acquisition

scheme. These allegations directly implicate the factors of whether the petition was motivated by

ill will or a desire to harass and whether Chen used the filing to obtain a disproportionate

advantage for himself.[169]

---

*Collier's* describes the totality test as a combination of the improper purpose and improper use tests, 2
Collier on Bankruptcy ¶ 303.16[1], but *Forever Green*'s totality test is broader, combining the improper purpose,
improper use, subjective, and objective tests. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 335-36.
[167] *E.g., In re Basil St. Partners, LLC*, 477 B.R. at 852.
[168] Dkt. No. 145, at 14.
[169] The latter factor encompasses creditor action to use "the bankruptcy to acquire corporate control." *See* 2 Collier
on Bankruptcy ¶ 303.16[1].

The evidence supports neither allegation against Chen, however. During cross-examination GAC's counsel asked Chen point-blank whether, if GAC's assets were liquidated in bankruptcy, he or someone connected to him would be interested in purchasing them. Without hesitation, Chen responded that he had absolutely no interest in purchasing GAC's assets because he does not believe the company's technology is still competitive. The Court finds this testimony credible, and GAC did not impeach it.

Notwithstanding Chen's testimony, CAG attempted to prove his motivations circumstantially through his involvement in prior bankruptcy cases where, GAC alleged, he engaged in similar attempts to acquire assets or leverage settlement. The Court concludes that the evidence advanced in support of this argument was uncompelling. The evidence showed that Chen became a director and co-CEO of a company called AirFastTickets, Inc. in December 2014 after making a bridge loan to it. The Delaware Court of Chancery appointed a receiver for the company in July 2015 and, six days after that appointment, certain of AirFast's creditors filed an involuntary petition against it.[170] Chen was not among the petitioning creditors. During that bankruptcy, AirTourist, Inc., a company of which Chen was the CEO, bought substantially all of AirFast's intellectual property, software, and certain related assets.[171] AirTourist later changed its name to Travana, Inc., and Chen was one of six petitioning creditors who filed an involuntary petition against it in April 2017.[172] An attachment to the petition showed that Chen alleged two claims: $697,219.00 for severance under an employment contract and $1,926.79 in unreimbursed

---

[170] Ex. SG17, at 2-8.
[171] Ex. SG20, at 7.
[172] Ex. SG25.

expenses.[173] Further facts about these cases were not introduced into evidence. Nowhere in these facts is any proof that Chen has previously attempted to use an involuntary petition to seize corporate control of a debtor or leverage a settlement. Importantly, there is no allegation that the Travana case was dismissed on bad faith grounds, which suggests that Chen's actions as a petitioning creditor were not deemed improper. At most, these facts show that Chen perhaps has some familiarity with purchasing assets in a § 363 sale and filing an involuntary petition. They do not create an inference that Chen is using this bankruptcy to take control of GAC.

The fee arrangements between Chen and the other Petitioning Creditors also do not create such an inference. While Chen did contact some of the Petitioning Creditors to ask whether they would like to join the petition and did guarantee the payment of their legal fees,[174] the evidence was clear that he is not paying their legal fees. The original six Petitioning Creditors testified, some with a resigned grimace, that they are paying their own way, each sharing in the fees in proportion to his or her claim asserted in the petition.[175] This is consistent with the retention letter from their firm.[176] While Chen's actions suggest that he occupies a leadership role among the Petitioning Creditors, that alone is insufficient to support GAC's takeover allegation, particularly considering a dearth of corroborating evidence that Chen aims to acquire GAC.

GAC also failed to present evidence supporting its allegation that Chen used this bankruptcy to leverage a settlement of his claims. Chen's testimony indicates that his goal in this

---

[173] *Id.* at 7.
[174] Ex. SG65, at 3-4.
[175] Carolynn Taft, Martie Nadauld, and Lori Chigbrow—the three creditors who joined the involuntary petition in June 2018—are not participating in this fee-sharing arrangement. The other Petitioning Creditors are paying for their legal fees. *See* Exs. 66, 67, & 68. These three creditors' combined claims constitute 2.4% of the total claims asserted by the Petitioning Creditors, however, so the original six Petitioning Creditors are paying a *de minimis* additional amount to cover Taft's, Nadauld's, and Chigbrow's pro rata share of fees.
[176] *Id.* at 3.

case is to receive payment of his claim either through a plan of reorganization or the appointment

of a trustee and liquidation of GAC's assets. There is a critical distinction between using an

involuntary petition as a cudgel to extort a settlement on the one hand and seeing an involuntary

petition through all the way to repayment on the other, and the Court concludes that GAC has not

shown that Chen's actions fall on the bad faith side of that ledger.

As with Chen, the other Petitioning Creditors are animated by a simple desire to get paid.

They admitted, almost uniformly, that they wanted to receive what they believed was owed to

them. And while the Petitioning Creditors did not, with the exception of the former employees

who filed claims with the Labor Commission, pursue customary debt-collection procedures

before filing this case, that fact does not deserve the weight normally accorded to it given GAC's

history and current financial situation.

This is not an instance where petitioning creditors have forced an otherwise healthy

company into bankruptcy for the simple purpose of debt collection. GAC is not a typical

business with regular operations and a steady stream of revenue. Instead, it is principally

dependent on the intermittent largesse of investors to continue its work and pay its bills. GAC,

like GBA, operated in fits and starts, alternating between periods marked by progress and high

employment and those marked by layoffs and lack of funding. Through all of that, neither

company was able to bring a product to market in over 30 years that provided sustained success

and generated stable revenues. All of the Petitioning Creditors, who, with the exception of Kent,

had worked for GAC and GBA during various times over the years, were well aware of those

companies' cyclical nature, but also their incipient potential, to which many of them hitched their

hopes not only of repayment, but also a career.

Although GBA had laid off and rehired employees in the past, the 2015 Layoffs at GAC

seemed to represent something more than just another trough in the cycle. Whereas prior layoffs

had stripped GBA down to an essential core of employees, the 2015 Layoffs prompted the

resignation of even long-tenured executives, such as Wilson and van der Westhuizen. More

importantly, the 2015 Layoffs were preceded by a multi-year period marked by an apparent lack

of productivity, low employment, and financial stress. GBA and GAC had struggled with cash

flow both pre- and post-Transition even though company executives were optimistic about

funding being just around the corner. The first year post-Transition—2013—was particularly

lean, and 2014 might have been just as bad or worse if Chen had not provided much-needed cash

to the company. When Chen left, and his capital along with him, GAC ground to a halt. As

mentioned previously, GAC only had $205 in its bank account by the end of April 2015.

It would have been rational to wonder, at that point, whether GAC could ever pay what

the Petitioning Creditors claim is owed to them, much less realize its long-held dream of

successfully bringing sustained autorotative flight to market. When Chigbrow called certain

former employees to inform them that they would be receiving some money under the Payment

Plan around May 2016, many had already given up hope of getting paid. And when some

Petitioning Creditors discovered that GAC had received funding in late 2016, a reasonable

person in their shoes would naturally view this as perhaps their best chance to get paid, a chance

that might not return for some time, if at all. Chen testified that people were excited when they heard of the funding; it was as if rain had come after a long drought.

But the Petitioning Creditors soon found that the rain wasn't falling on them. During 2017, GAC burned through cash at a steady rate, which, other than relatively small amounts paid toward Unpaid Compensation and the Labor Commission claims, was not being paid to the Petitioning Creditors and other similarly situated former employees. In other words, other creditors were being preferred at the Petitioning Creditors' expense. And, based on GBA's and GAC's performance history, one could reasonably question whether the sums spent on getting the business running again would bear fruit before they were exhausted. Accordingly, the Petitioning Creditors' motivation can be seen as a desire to protect themselves against other creditors obtaining a disproportionate share of GAC's assets as well as a desire to prevent dissipation of those assets before this round of funding ran out. Both are proper reasons to file an involuntary petition.[177] Viewed subjectively and objectively, the Court concludes that the Petitioning Creditors' motivations do not evince bad faith. At bottom, they simply wanted to get paid before the next drought returned.

To summarize, many of the factors in the totality test favor the Petitioning Creditors. They have satisfied the statutory criteria of § 303, and the petition is meritorious. The petition's timing was not suspicious, nor was it used to gain a tactical advantage in other actions. While GAC has questioned the Petitioning Creditors' motives, it is clear that they did not file the petition to obtain a disproportionate advantage for themselves or to harass or embarrass the

---

[177] *See Gen. Trading Inc.*, 119 F.3d at 1502; *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336.

debtor. To the contrary, they were the ones being disadvantaged and simply wanted to collect on years-old debt. The only factor that cuts in GAC's favor is that the Petitioning Creditors have not pursued customary debt-collection remedies before arriving in bankruptcy court. But given the weight of the other factors and the circumstances surrounding GAC's history and financial situation, this is insufficient to carry GAC's burden to show that the petition was filed in bad faith. Accordingly, the Court will deny GAC's motion to dismiss the involuntary petition.

## C. GAC's Motion to Dismiss Under Section 305(a)

The parties also tried GAC's separate motion under § 305(a) to dismiss this case or, in the alternative, suspend proceedings for four months.[178] When petitioning creditors prevail at trial on an involuntary petition, the Code obliges courts to enter an order for relief.[179] Despite satisfaction of the statutory requirements of § 303, however, § 305(a) provides that a court may dismiss a case or suspend all proceedings in a case,[180] but only if it finds that the interests of creditors and the debtor would be better served by dismissal or suspension. Dismissal or suspension is an "extraordinary remedy of narrow breadth,"[181] and a mere balancing of harm to the debtor and creditors will not suffice to satisfy § 305(a).[182] The party seeking relief under § 305(a) bears the burden to show that dismissal or suspension would benefit both parties.[183]

---

[178] Dkt. No. 103. Westford Global Holdings Inc., SGS Global Holdings Inc., Lake Zurich Holdings Ltd. (Funds), and West Mountain Partners, L.P. filed joinders in the motion. Dkt. Nos. 129 & 132.

[179] *See* § 303(h).

[180] *Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*, 370 B.R. 236, 246 (9th Cir. BAP 2007) ("[N]otwithstanding a bankruptcy court's jurisdiction over an involuntary case pursuant to § 303, § 305(a) provides that the bankruptcy court may dismiss an involuntary case, or suspend all proceedings in that case, and thereby decline to exercise that jurisdiction.").

[181] *Id.* at 247 (internal quotation marks omitted).

[182] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008).

[183] *Id.* at 462-63.

Courts employ a totality of the circumstances test to evaluate § 305(a) motions,[184] and modern decisions typically look at seven factors:

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.[185]

These factors are not exclusive, and while "no one factor is more important than another,"[186] they may be given different weight depending on the case.[187] "A bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit to seek dismissal. Reasoned judgment based on articulated facts is the only test which the statute itself requires."[188]

In addition to these factors, GAC has argued that the Court should consider the extent to which the case presents unsettled issues of non-bankruptcy law. GAC asserts that there are two unsettled issues under Utah law: first, whether Utah Code Ann. § 34-28-3(6)(b)'s requirement that an employee must authorize the withholding of wages in writing applies to officers and to future income; and second, whether Utah Code Ann. § 34-28-1 *et seq.* precludes Carron, Parry, and Nadauld from asserting claims in excess of the amounts claimed with the Labor

---

[184] *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015).
[185] *In re Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65.
[186] *In re EB Holdings II, Inc.*, 589 B.R. 704, 727 n.73 (Bankr. D. Nev. 2017).
[187] *In re Monitor Single Lift I, Ltd.*, 381 B.R. at 465.
[188] *In re Naartjie Custom Kids, Inc.*, 534 B.R. 416, 425 (Bankr. D. Utah 2015) (quoting *In re First Assured Warranty Corp.*, 383 B.R. 502, 530 (Bankr. D. Colo. 2008)).

Commission.[189] While some courts have relied on this factor under § 305(a),[190] the Court does

not give it any weight in this case. Although few authorities appear to have addressed the legal

questions GAC has raised, the Court has already determined that they either do not create a bona

fide dispute as to the Petitioning Creditors' claims or do not need to be resolved to reach a

conclusion under § 303. Since there is no need for a state court to decide an intractable issue of

state law, this factor does not weigh in favor of dismissal.

The remaining factors tend to fall on opposing sides of the ledger. On the one hand, other

forums exist to adjudicate the parties' disputes and federal proceedings may not be necessary to

reach a just and equitable solution. On the other hand, this case does not impinge on an already-

begun non-federal insolvency proceeding, and while the Petitioning Creditors filed this case to

receive payment, that was not an improper purpose under the facts of this case. In short, this

dispute could proceed in bankruptcy court but could exist comfortably outside it. The most

pertinent factor in deciding between those two options is whether the parties will be able to

achieve a less expensive out-of-court workout that serves all of their interests. While § 305(a)(1)

reflects a congressional policy to encourage workouts over bankruptcy,[191] the Court must be

satisfied that a debtor and its creditors would in fact be better off pursuing such a course.

GAC's amenability to settlement favors an out-of-court workout. Even though GAC

ousted Groen over the repayment of old debts, it now believes it can reach settlements with at

least six of the Petitioning Creditors outside of bankruptcy. Its offer to repay what Carron, Parry,

Nadauld, Chigbrow, and Taft have asserted in the involuntary petition appears to be a good faith

---

[189] Dkt. No. 103, at 6-9.
[190] *See In re St. Marie Dev. Corp. of Mont.*, 334 B.R. 663, 671-72 (Bankr. D. Mont. 2005).
[191] *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015 (Bankr. D. Utah 1982).

effort to act on that belief, though it is not without controversy, as the parties have disputed whether GAC's settlement offers in the case have been furtive attempts to undermine the standing of the non-settling Petitioning Creditors.[192]  GAC has indicated its willingness to use mediation, arbitration, and, as a last resort, litigation to resolve unsettled claims. It also believes that it is on the verge of generating enough revenue to pay the claims of Wilson and van der Westhuizen. This optimism stops when GAC speaks of Chen's claim, however. GAC hotly disputed his claim throughout trial and readily admits that it is not willing to resolve it "without substantial litigation."[193]

While it appears that Chen's claim will be litigated whether this dispute ends up in bankruptcy or not, an order for relief would likely subject the remaining Petitioning Creditors' claims to litigation as well. The Funds and West Mountain threatened fierce claim litigation, which would no doubt diminish any advantage a bankruptcy proceeding would have in economy and efficiency of administration over a non-bankruptcy action, which would have to begin from scratch. In addition, claim litigation would drive up costs relative to a potential out-of-court settlement.

Bankruptcy would likely be costly for GAC as well. The funding it has received and the contracts it has negotiated might evaporate, possibly removing reorganization as an option. If GAC were liquidated, odds are low that creditors would receive a substantial dividend. While GAC has patents of unknown worth, its assets essentially consist of its bank accounts, which

---

[192] *Compare* Dkt. No. 144, at 2-5, *with* Dkt. No. 145, at 17-18. GAC later filed a motion to approve settlement agreements with Nadauld, Chigbrow, and Taft, *see* Dkt. No. 163, and at the hearing on that motion counsel for GAC clarified that the settlements would have no effect on the Petitioning Creditors' standing under § 303.
[193] Dkt. No. 135, at 2.

may have had slightly more than $1 million left in them as of September 2018, assuming a cash

burn rate of $185,894.85 per month. The Petitioning Creditors asserted claims totaling

$1,587,212.07, which is already above identifiable assets, and administrative costs and the

claims of other creditors would further diminish potential returns. So even if the Petitioning

Creditors' claims survived litigation, there would be little chance of meaningful repayment.

In some ways, the question becomes whether GAC can return more to creditors inside

bankruptcy or outside it. Based on the facts of this case, the Court concludes that the best chance

for creditors to be paid a meaningful return is outside of bankruptcy. Many of the Petitioning

Creditors would avoid the costs of claim litigation and the prospect of sharing with other

creditors in a pool of limited assets. At the same time, GAC would have a better chance of

obtaining cash for settlements of creditors' claims. But for creditors to be better off outside of

bankruptcy, GAC would have to deliver on its promises. After reviewing GAC's and GBA's

history, the Court shares the Petitioning Creditors' well-founded skepticism regarding GAC's

promises that funding or contracts are right around the corner. Over the course of three decades

those companies have repeatedly approached the threshold of potential success, only to linger

briefly and turn away empty-handed. Moreover, GAC operates in an industry, the apparent

progress of AutoGyro notwithstanding, where sustained success seems elusive.

Even so, GAC has provided enough evidence to be given a chance to prove that this time

is different. While GAC emphasized its many irons in the fire, some of those projects may be

years, if not decades, away from realization. The crucial development is GAC's contract with

Jugoimport to build and flight test a Hawk 5 prototype. Commercial production is admittedly not

61

guaranteed, but according to Gen. Michel this collaboration could yield revenue within months after a prototype is produced. In the meantime, GAC is attempting to generate revenue through the sale of SparrowHawk inventory.

Accordingly, after considering the good faith efforts of GAC to settle some of the Petitioning Creditors' claims, the expense of bankruptcy and the harm it could cause to GAC, and the likelihood that GAC will achieve success on the Hawk 5 or another project, and after assessing the possibility for meaningful recovery for creditors in a liquidation and outside of bankruptcy, the Court concludes that the interests of creditors and GAC would be better served by suspension of these proceedings for 60 days. After that time, the Court will evaluate GAC's progress on the Hawk 5 and other projects, obtaining funding from investors, and its efforts to settle the Petitioning Creditors' claims. Depending on the level of progress on those fronts, the Court will consider extending the suspension, dismissing the case, or entering an order for relief.

### D. GAC's Motion for a Bond Under Section 303(e)

GAC requested that the Petitioning Creditors be required to post a bond under § 303(e) to compensate it, in the event the petition is dismissed, for the damage it has allegedly suffered as a result of the involuntary petition.[194] Section 303(e) permits a court to order that a petitioning creditor "file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section." In turn, § 303(i) allows a court, upon dismissal of the petition, to grant judgment against a petitioning creditor for the debtor's costs and fees and, if the court finds that the petitioner filed the petition in bad faith, for any damages proximately caused by the

---

[194] Dkt. No. 51.

filing or punitive damages. Since the Court has concluded that the Petitioning Creditors did not

file this petition in bad faith, damages under § 303(i)(2) would not be available, but "[b]ad faith

is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)."[195]

Even if the Court dismissed the case under § 305(a) after the 60-day suspension or some

longer period, it would not grant judgment under § 303(i)(1). While § 305(a) dismissals have

supported the imposition of fees and costs,[196] the Court concludes that the facts of this case do

not warrant such a result. Section 303(i)(1) gives a court discretion to award fees and costs, and

that discretion is guided by a totality of the circumstances test, which considers "(1) the merits of

the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor;

(3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation

and objectives behind the filing of the petition."[197] While GAC does not appear to have engaged

in improper conduct, the Court has already concluded that the petition is meritorious and the

Petitioning Creditors' motivations in filing the petition were proper. And because the Court has

concluded that this dispute could proceed in bankruptcy court, the Petitioning Creditors' actions

in filing and pursuing this petition have been reasonable. The Court declines to require the

Petitioning Creditors to pay for GAC's fees and costs under these circumstances, so a bond is not

necessary. The Court will deny GAC's motion under § 303(e).

---

[195] *Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 235 (2d Cir. 2015).
[196] *In re Macke Int'l Trade, Inc.*, 370 B.R. at 248-53.
[197] *Crest One Spa*, 793 F.3d at 235 (quoting *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010)).

**IV. CONCLUSION**

The Petitioning Creditors have satisfied the statutory requirements of § 303, and the

petition was not filed in bad faith. But because of the circumstances of this case, the Court

declines to enter an order for relief at this time. After the 60-day suspension, the Court will

examine GAC's progress and reevaluate what course of action is in GAC's and its creditors' best

interests. A separate Order and Judgment will be entered in accordance with this Memorandum

Decision.

_____END OF DOCUMENT_____

_____oOo0oOo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| George B. Hofmann | ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com |
| | mparks@cohnekinghorn.com |
| Adam H Reiser | areiser@cohnekinghorn.com |
| Jeffrey L. Trousdale | jtrousdale@cohnekinghorn.com, nlakey@cohnekinghorn.com |
| Penrod W. Keith | pkeith@djplaw.com, khughes@djplaw.com |
| Michael R. Johnson | mjohnson@rqn.com, docket@rqn.com, dburton@rqn.com |
| Bruce H. White | bwhite@parsonsbehle.com, chuston@parsonsbehle.com |
| Gerald H. Suniville | gsuniville@fabianvancott.com, nnelson@fabianvancott.com |
| U.S. Trustee | USTPRegion19.SK.ECF@usdoj.gov |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

- None.